UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

PANAMAX BULK AS,                                08 Civ. 8601 (JSR)

                    Plaintiffs,

        -against-

DAMPSKIBSSELSKABET NORDEN AS,

                    Defendants.

------------------------------------------------------X

## DECLARATION OF PAUL GRIFFITHS

I, PAUL GRIFFITHS, pursuant to Section 1746 of Title 28 of the United States Code,
hereby declare and say the following under penalty of perjury:

1.      I am a solicitor of the Supreme Court of England and Wales and am a senior

partner with the law firm of Bentleys, Stokes and Lowless in London, England. I

represent Defendant DAMPSKIBSSELSKABET NORDEN AS ("NORDEN") and I

am fully familiar with the facts and circumstances of the disputes between the parties,

the now concluded arbitration at London, England to resolve those disputes, and the

proceedings before this Court to date.

2. I make this Declaration in support of NORDEN's petition to recognize and enforce the Arbitral Award rendered at London, England as a United States Judgment against Defendant PANAMAX BULK AS ("PANAMAX").

3. I have read and understood the contents of this Declaration and have assisted in its preparation. Insofar as the contents of this Declaration are within my own knowledge they are true. Insofar as the contents of this Declaration are not within my own direct knowledge, they are true to the best of my information and belief.

4. NORDEN entered into three maritime Contracts of Affreightment ("COAs") with non-party RTI, Ltd. dated September 6, 2007 and two (2) dated November 30, 2007, copies of which are annexed hereto as Exhibits A, B and C respectively.

5. Each of the COAs contained a mandatory and binding provision that required arbitration of all disputes thereunder be brought before the London Maritime Arbitrators Association ("LMAA") under English law.

6. PANAMAX acted as broker on behalf of NORDEN in respect to each of the COAs.

7. As compensation for its services, NORDEN agreed to allow PANAMAX a commission of 1.25% upon freight, detention and demurrage earned by NORDEN under the COAs.

8. It was represented to NORDEN by PANAMAX at the time the COAs were negotiated that PANAMAX's alleged co-broker, Natica, was to also receive a commission of 1.25% upon freight, detention and demurrage earned by NORDEN

under the COAs and RTI (or Rusal, RTI's parent company) was to receive a 1.25% address commission.

9.     In February 2008, NORDEN learned that Natica was not a broker involved in these transactions and that RTI/Rusal had not received any address commission.

10.     Accordingly, NORDEN subsequently took the position that as a matter of English law PANAMAX had breached its fiduciary duties as an agent; breached its duties to make full disclosure to NORDEN as to the true nature of the broking arrangements; and breached the implied terms of good faith and fidelity which all brokers have in contracts of this nature in favour of their principals.

11.     As a result of those breaches, NORDEN terminated the COAs and demanded PANAMAX return all commissions NORDEN had paid to PANAMAX.

12.     PANAMAX thereafter commenced three separate arbitrations against NORDEN in London under the COAs, based upon the Contract Rights of Third Parties Act, seeking damages from NORDEN for failure to pay commissions in the agreed amount.

13.     NORDEN counterclaimed against PANAMAX to recover the amounts it had paid in commissions to PANAMAX.

14.     The three arbitrations were ordered to be heard concurrently for purposes of submissions and issuance of Awards by the Arbitrators.

15.     The London Arbitrators issued their Final Reasoned Awards on 17th March 2010. A copy of the Final Awards and Reasons therefore is annexed hereto as Exhibit D.

16.     Pursuant to the Final Awards, the Arbitrators held that PANAMAX owed the
net sum of $1,366,566 to NORDEN, together with interest thereon at the rate of 4%
per annum compounded quarterly from 5 September 2008 until the date of payment.

17.     The Tribunal reserved determination of the issue of costs and retained
jurisdiction to issue a further award on costs if the parties fail to agree same. This,
however, does not change the fact that the Final Awards dated 17th March 2010 are
capable of enforcement as a Judgment of this Court.

18.     NORDEN has demanded payment of PANAMAX for the amounts due under
the Final Awards which remain unpaid.

19.     I am advised that England and the United States are both parties to the New
York Convention on the Recognition and Enforcement of Foreign Arbitral Awards.
The New York Convention provides that upon supplying certified copies of the
agreement to arbitrate and the arbitral award, a court in a nation that is party to the
New York Convention must recognize and enforce that award as a domestic
judgment, if it is made timely, and if none of the few reasons designated in the
Convention for non-recognition are present.

20.     This application is timely as it is made well within the time period permitted
under the New York Convention, and it is respectfully submitted that none of the
designated reasons listed in the Convention can in good faith be raised here by
PANAMAX.

21.     It is also noted that PANAMAX has voluntarily submitted to the personal
jurisdiction of this Court by virtue of having commenced its Rule B attachment action

against NORDEN pursuant to which NORDEN had given security in the sum of $12 million to PANAMAX for its claims. This Court therefore has *in personam* jurisdiction over PANAMAX sufficient to render judgment against PANAMAX based on the Award.

22.     Accordingly, recognition and enforcement of the Final Arbitral Awards rendered in London before the LMAA should be had, and the Awards should be made a Judgment of the United States.

23.     There has been no prior request for the relief sought herein.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: London, England

April 20, 2010

PAUL GRIFFITHS

# Exhibit A

*Griffiths Declaration*

| 1. Shipbroker | RECOMMENDED **Original** |
|---|---|
| | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994) (To be used for trades for which no specially approved form is in force) CODE NAME: "GENCON"  Part I |
| | 2. Place and date    Moscow, 6th September, 2007 |

| 3. Owners/Place of business (Cl. 1) | 4. Charterers/Place of business (Cl. 1) |
|---|---|
| Dampskibsselskabet NORDEN A/S, Copenhagen, Denmark | RTI Ltd., Jersey |

| 5. Vessel's name (Cl. 1) | 6. GT/NT (Cl. 1) |
|---|---|
| tonnage to be nominated by Owners | |

| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1) | 8. Present position (Cl. 1) |
|---|---|
| | |

| 9. Expected ready to load (abt.) (Cl. 1) | |
|---|---|
| See Rider Clause 35 | |

| 10. Loading port or place (Cl. 1) | 11. Discharging port or place (Cl. 1) |
|---|---|
| 1 (one) safe berth Welpa , 11,7 m sw | 1(one) safe anchorage/safe berth Dneprobugskiy, max 9,8 m bw |

| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo" (Cl. 1) |
|---|
| about 540,000 metric tons bauxite in bulk to be shipped evenly spread within 2008 in lots of 60,000 metric tons 10 per cent more or less in Owners' option |

| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4) | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4) |
|---|---|
| US$ 62,95 per metric ton FIOT 1/1 | 95 % of freight to be paid within 7 banking days after signing/releasing Bills of Lading (See Rider Clause 20) |

| 15. State if vessel's cargo handling gear shall not be used (Cl. 5) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl. 6) |
|---|---|
| | (a) Laytime for loading |
| | See Rider Clause 26 (a) |

| 17. Shippers/Place of business (Cl. 6) | (b) Laytime for discharging |
|---|---|
| | See Rider Clause 26 (a) |

| 18. Agents (loading) (Cl. 6) | (c) Total laytime for loading and discharging |
|---|---|
| See Rider Clause 22 | |

| 19. Agents (discharging) (Cl. 6) | |
|---|---|
| See Rider Clause 22 | |

| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7) | 21. Cancelling date (Cl. 9) |
|---|---|
| US$ 50,000 per day pro rata / CHD WTS both ends (See Rider Clause 31) | See Rider Clause 35 |
| | 22. General Average to be adjusted at (Cl. 12) |
| | London |

| 23. Freight Tax (state if for the Owners' account (Cl. 13 (c)) | 24. Brokerage commission and to whom payable (Cl. 15) |
|---|---|
| | commission 3,75 per cent  for division  to be paid |

| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19 (a) shall apply) (Cl. 19) | by Owners |
|---|---|
| English Law to apply. Arbitration in London (See Rider Clause 29) | |
| (a) State maximum amount for small claims/shortened arbitration (Cl. 19) | 26. Additional clauses covering special provisions, if agreed |
| | Rider Clauses 20-38 included in this Charter Party |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| Panamax Bulk AS Drammensveien 123 P.O. Box 205 Skoyen   as agents | |

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

| 1. Shipbroker | RECOMMENDED **Original** |
|---|---|
| | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL |
| | UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994) |
| | (To be used for trades for which no specially approved form is in force) |
| | CODE NAME: "GENCON"           Part I |
| | 2. Place and date    Moscow, 6th September, 2007 |

| 3. Owners/Place of business (Cl. 1) | 4. Charterers/Place of business (Cl. 1) |
|---|---|
| Dampskibsselskabet NORDEN A/S, Copenhagen, Denmark | RTI Ltd., Jersey |

| 5. Vessel's name (Cl. 1) | 6.GT/NT(Cl.1) |
|---|---|
| tonnage to be nominated by Owners | |

| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1) | 8. Present position (Cl. 1) |
|---|---|
| | |

| 9. Expected ready to load (abt.) (Cl. 1) | |
|---|---|
| See Rider Clause 35 | |

| 10. Loading port or place (Cl. 1) | 11. Discharging port or place (Cl. 1) |
|---|---|
| 1 (one) safe berth Welpa , 11,7 m sw | 1(one) safe anchorage/safe berth Dneprobugskiy, max 9,8 m bw |

12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo" (Cl. 1)

about 540,000 metric tons bauxite in bulk to be shipped evenly spread within 2008
in lots of 60,000 metric tons 10 per cent more or less in Owners' option

| 13. Freight rate (also state whether freight prepaid or payable on delivery (Cl. 4) | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4) |
|---|---|
| US$ 62,95 per metric ton FIOT 1/1 | 95 % of freight to be paid within 7 banking days after signing/releasing Bills of Lading (See Rider Clause 20) |

| 15. State if vessel's cargo handling gear shall not be used (Cl. 5) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl. 6) |
|---|---|
| | (a) Laytime for loading |
| 17. Shippers/Place of business (Cl. 6) | See Rider Clause 26 (a) |
| | (b) Laytime for discharging |
| 18. Agents (loading) (Cl. 6) | See Rider Clause 26 (a) |
| See Rider Clause 22 | |
| 19. Agents (discharging) (Cl. 6) | (c) Total laytime for loading and discharging |
| See Rider Clause 22 | |

| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7) | 21. Cancelling date (Cl. 9) |
|---|---|
| US$ 50,000 per day pro rata / DHD WTS both ends (See Rider Clause 31) | See Rider Clause 35 |
| | 22. General Average to be adjusted at (Cl. 12) |
| | London |

| 23. Freight Tax (state if for the Owners' account (Cl .13 (c)) | 24. Brokerage commission and to whom payable (Cl. 15) |
|---|---|
| | commission 3,75 per cent for division to be paid by Owners |
| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19 (a) shall apply) (Cl. 19) | |
| English Law to apply, Arbitration in London (See Rider Clause 29) | |

| (a) State maximum amount for small claims/shortened arbitration (Cl. 19) | 26. Additional clauses covering special provisions, if agreed |
|---|---|
| | Rider Clauses 20-38 included in this Charter Party |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| |  |

2

# PART II
## "Gencon" Charter (As Revised 1922,1976 and 1994)

1. It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that:

   The said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility) as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near thereto as she may safely get and lie always afloat, and there deliver the cargo.

2. **Owners' Responsibility Clause**

   The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.

   And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

3. **Deviation Clause** ~~on route for bunkering and in case of emergency~~

   The Vessel has liberty to call at any port or ports ~~in any order, for any purpose,~~ to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

4. **Payment of Freight**

   (a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo. ~~see Rider Clause 20~~

   ~~(b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost.~~

   ~~Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid.~~

   ~~(c) On delivery. If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (c), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally.~~

   ~~Cash on Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses.~~

5. **Loading/Discharging**

   **(a) Costs/Risks**

   The cargo shall be brought into the holds, loaded, stowed and/or trimmed, ~~tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.~~

   **(b) Cargo Handling Gear**

   ~~Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power - pro rata the total number of cranes/winches required - at that time for the loading/discharging of cargo under this Charter Party, shall not count as laytime or time on demurrage. On request the Owners shall provide free of charge crane men/winch men from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master.~~

   **(c) Stevedore Damage** ~~see Rider Clause 37~~

   ~~The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability.~~

   ~~The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and anytime lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.~~

6. **Laytime**

   **\*(a) Separate laytime for loading and discharging** ~~see Rider Clause 26~~

   ~~The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.~~

   ~~The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.~~

   ~~\*(b) Total laytime for loading and discharging~~

   ~~The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.~~

   ~~(c) Commencement of laytime (loading and discharging)~~

   ~~Laytime for loading and discharging shall commence at 13.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06.00 hours next working day if notice given during office hours after 12.00 hours. Notice of~~

   ~~readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.~~

   ~~If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/discharging berth shall not count as laytime.~~

   ~~If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime.~~

   Time used before commencement of lay time shall count .

   ~~\*Indicate alternative (a) or (b) as agreed, in Box 16~~

7. **Demurrage** ~~see Rider Clause 31~~

   ~~Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice.~~

   ~~In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours' written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.~~

8. **Lien Clause**

   The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.

9. **Cancelling Clause**

   (a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this Charter Party.

   (b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.

   Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date.

   The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause.

10. **Bills of Lading** ~~in indicate~~

    Bills of Lading shall be presented and signed by the Master as per the "Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party, or by the Owners' agents provided written authority has been given by Owners to the agents, a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the Owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the Owners than those assumed by the Owners under this Charter Party.

11. **Both-to-Blame Collision Clause**

    If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

12. **General Average and New Jason Clause**

    General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see Clause 2).

    If General Average is to be adjusted in accordance with the law and practice of the United States of America, the following Clause shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo shippers, consignees or the owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Owners before delivery.".

13. **Taxes and Dues Clause**

    (a) On Vessel - The Owners shall pay all dues, charges and taxes customarily levied on the Vessel, howsoever the amount thereof may be assessed.

    (b) On cargo - The Charterers shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed.

    ~~(c) On freight - Unless otherwise agreed in Box 23, taxes levied on the freight shall be for the Charterers' account.~~

14. **Agency**   See Rider Clause 22   207

~~In every case the Owners shall appoint their own Agent both at the port of~~   208
~~loading and the port of discharge.~~   209

15. **Brokerage**   210

A brokerage commission at the rate stated in Box 24 on the freight, dead-freight   211
and demurrage earned is due to the party mentioned in Box 24.   212

~~In case of non-execution 1/3 of the brokerage on the estimated amount of~~   213
~~freight to be paid by the party responsible for such non-execution to the~~   214
~~Brokers as indemnity for the latter's expenses and work. In case of more~~   215
~~voyages the amount of indemnity to be agreed.~~   216

16. **General Strike Clause**   217

(a) If there is a strike or lock-out affecting or preventing the actual loading of the   218
cargo, or any part of it, when the Vessel is ready to proceed from her last port or   219
at any time during the voyage to the port or ports of loading or after her arrival   220
there, the Master or the Owners may ask the Charterers to declare, that they   221
agree to reckon the laydays as if there were no strike or lock-out. Unless the   222
Charterers have given such declaration in writing (by telegram, if necessary)   223
within 24 hours, the Owners shall have the option of cancelling this Charter   224
Party. If part cargo has already been loaded, the Owners must proceed with   225
same, (freight payable on loaded quantity only) having liberty to complete with   226
other cargo on the way for their own account.   227

(b) If there is a strike or lock-out affecting or preventing the actual discharging   228
of the cargo on or after the Vessel's arrival at or off port of discharge and same   229
has not been settled within 48 hours, the Charterers shall have the option of   230
keeping the Vessel waiting until such strike or lock-out is at an end against   231
paying half demurrage after expiration of the time provided for discharging   232
until the strike or lock-out terminates and thereafter full demurrage shall be   233
payable until the completion of discharging, or of ordering the Vessel to a safe   234
port where she can safely discharge without risk of being detained by strike or   235
lock-out. Such orders to be given within 48 hours after the Master or the   236
Owners have given notice to the Charterers of the strike or lock-out affecting   237
the discharge. On delivery of the cargo at such port, all conditions of this   238
Charter Party and of the Bill of Lading shall apply and the Vessel shall receive   239
the same freight as if she had discharged at the original port of destination,   240
except that if the distance to the substituted port exceeds 100 nautical miles,   241
the freight on the cargo delivered at the substituted port to be increased in   242
proportion.   243

(c) Except for the obligations described above, neither the Charterers nor the   244
Owners shall be responsible for the consequences of any strikes or lock-outs   245
preventing or affecting the actual loading or discharging of the cargo.   246

17. **War Clause ("Voywar 1993")**   247

(1) For the purpose of this Clause, the words:   248

(a) The "Owners" shall include the shipowners, bareboat charterers,   249
disponent owners, managers or other operators who are charged with the   250
management of the Vessel, and the Master; and   251

(b) "War Risks" shall include any war (whether actual or threatened), act of   252
war, civil war, hostilities, revolution, rebellion, civil commotion, warlike   253
operations, the laying of mines (whether actual or reported), acts of piracy,   254
acts of terrorists, acts of hostility or malicious damage, blockades   255
(whether imposed against all Vessels or imposed selectively against   256
Vessels of certain flags or ownership, or against certain cargoes or crews   257
or otherwise howsoever), by any person, body, terrorist or political group,   258
or the Government of any state whatsoever, which, in the reasonable   259
judgement of the Master and/or the Owners, may be dangerous or are   260
likely to be or to become dangerous to the Vessel, her cargo, crew or other   261
persons on board the Vessel.   262

(2) If at any time before the Vessel commences loading, it appears that, in the   263
reasonable judgement of the Master and/or the Owners, performance of the   264
Contract of Carriage, or any part of it, may expose, or is likely to expose,   265
the Vessel, her cargo, crew or other persons on board the Vessel to War   266
Risks, the Owners may give notice to the Charterers cancelling this   267
Contract of Carriage, or may refuse to perform such part of it as may   268
expose, or may be likely to expose, the Vessel, her cargo, crew or other   269
persons on board the Vessel to War Risks; provided always that if this   270
Contract of Carriage provides that loading or discharging is to take place   271
within a range of ports, and at the port or ports nominated by the Charterers   272
the Vessel, her cargo, crew, or other persons on board the Vessel may be   273
exposed, or may be likely to be exposed, to War Risks, the Owners shall   274
first require the Charterers to nominate any other safe port which lies   275
within the range for loading or discharging, and may only cancel this   276
Contract of Carriage if the Charterers shall not have nominated such safe   277
port or ports within 48 hours of receipt of notice of such requirement.   278

(3) The Owners shall not be required to continue to load cargo for any voyage,   279
or to sign Bills of Lading for any port or place, or to proceed or continue on   280
any voyage, or on any part thereof, or to proceed through any canal or   281
waterway, or to proceed to or remain at any port or place whatsoever,   282
where it appears, either after the loading of the cargo commences, or at   283
any stage of the voyage thereafter before the discharge of the cargo is   284
completed, that, in the reasonable judgement of the Master and/or the   285
Owners, the Vessel, her cargo (or any part thereof), crew or other persons   286
on board the Vessel (or any one or more of them) may be, or are likely to be,   287
exposed to War Risks. If it should so appear, the Owners may by notice   288
request the Charterers to nominate a safe port for the discharge of the   289
cargo or any part thereof, and if within 48 hours of the receipt of such   290
notice, the Charterers shall not have nominated such a port, the Owners   291
may discharge the cargo at any safe port of their choice (including the port   292
of loading) in complete fulfilment of the Contract of Carriage. The Owners   293
shall be entitled to recover from the Charterers the extra expenses of such   294
discharge and, if the discharge takes place at any port other than the   295
loading port, to receive the full freight as though the cargo had been   296
carried to the discharging port and if the extra distance exceeds 100 miles,   297
to additional freight which shall be the same percentage of the freight   298
contracted for as the percentage which the extra distance represents to   299
the distance of the normal and customary route, the Owners having a lien   300
on the cargo for such expenses and freight.   301

(4) If at any stage of the voyage after the loading of the cargo commences, it   302
appears that, in the reasonable judgement of the Master and/or the   303
Owners, the Vessel, her cargo, crew or other persons on board the Vessel   304
may be, or are likely to be, exposed to War Risks and it is at the route   305
(including any canal or waterway) which is normally and customarily used   306
in a voyage of the nature contracted for, and there is another longer route   307
to the discharging port, the Owners shall give notice to the Charterers that   308
this route will be taken. In this event the Owners shall be entitled, if the total   309
extra distance exceeds 100 miles, to additional freight which shall be the   310
same percentage of the freight contracted for as the percentage which the   311
extra distance represents to the distance of the normal and customary   312
route.   313

(5) The Vessel shall have liberty:-   314

(a) to comply with all orders, directions, recommendations or advice as to   315
departure, arrival, routes, sailing in convoy, ports of call, stoppages,   316
destinations, discharge of cargo, delivery or in anyway whatsoever which   317
are given by the Government of the Nation under whose flag the Vessel   318
sails, or other Government to whose laws the Owners are subject, or any   319
other Government which so requires, or any body or group acting with the   320
power to compel compliance with their orders or directions;   321

(b) to comply with the orders, directions or recommendations of any war   322
risks underwriters who have the authority to give the same under the terms   323
of the war risks insurance;   324

(c) to comply with the terms of any resolution of the Security Council of the   325
United Nations, any directives of the European Community, the effective   326
orders of any other Supranational body which has the right to issue and   327
give the same, and with national laws aimed at enforcing the same to which   328
the Owners are subject, and to obey the orders and directions of those who   329
are charged with their enforcement;   330

(d) to discharge at any other port any cargo or part thereof which may   331
render the Vessel liable to confiscation as a contraband carrier;   332

(e) to call at any other port to change the crew or any part thereof or other   333
persons on board the Vessel when there is reason to believe that they may   334
be subject to internment, imprisonment or other sanctions;   335

(f) where cargo has not been loaded or has been discharged by the   336
Owners under any provisions of this Clause, to load other cargo for the   337
Owners' own benefit and carry it to any other port or ports whatsoever,   338
whether backwards or forwards or in a contrary direction to the ordinary or   339
customary route.   340

(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this   341
Clause anything is done or not done, such shall not be deemed to be a   342
deviation, but shall be considered as due fulfilment of the Contract of   343
Carriage.   344

18. **General Ice Clause**   345
*Port of loading*   346

(a) In the event of the loading port being inaccessible by reason of ice when the   347
Vessel is ready to proceed from her last port or at any time during the voyage or   348
on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the   349
Master for fear of being frozen in is at liberty to leave without cargo, and this   350
Charter Party shall be null and void.   351

(b) If during loading the Master, for fear of the Vessel being frozen in, deems it   352
advisable to leave, he has liberty to do so with what cargo he has on board and   353
to proceed to any other port or ports with option of completing cargo for the   354
Owners' benefit for any port or ports including port of discharge. Any part   355
cargo thus loaded under this Charter Party to be forwarded to destination at the   356
Vessel's expense but against payment of freight, provided that no extra   357
expenses be thereby caused to the Charterers, freight being paid on quantity   358
delivered (in proportion if lumpsum), all other conditions as per this Charter   359
Party.   360

(c) In case of more than one loading port, and if one or more of the ports are   361
closed by ice, the Master or the Owners to be at liberty either to load the part   362
cargo at the open port and fill up elsewhere for their own account as under   363
section (b) or to declare the Charter Party null and void unless the Charterers   364
agree to load full cargo at the open port.   365

*Port of discharge*   366

(a) Should ice prevent the Vessel from reaching port of discharge the   367
Charterers shall have the option of keeping the Vessel waiting until the re-   368
opening of navigation and paying demurrage or of ordering the Vessel to a safe   369
and immediately accessible port where she can safely discharge without risk of   370
detention by ice. Such orders to be given within 48 hours after the Master or the   371
Owners have given notice to the Charterers of the impossibility of reaching port   372
of destination.   373

(b) If during discharging the Master for fear of the Vessel being frozen in deems   374
it advisable to leave, he has liberty to do so with what cargo he has on board   375
and to proceed to the nearest accessible port where she can safely discharge.   376

(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall   377
apply and the Vessel shall receive the same freight as if she had discharged at   378
the original port of destination, except that if the distance of the substituted port   379
exceeds 100 nautical miles, the freight on the cargo delivered at the substituted   380
port to be increased in proportion.   381

19. **Law and Arbitration**   see Rider Clause 29   382

~~*(a) This Charter Party shall be governed by and construed in accordance with*~~   383
~~*English law and any dispute arising out of this Charter Party shall be referred to*~~   384
~~*arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or*~~   385
~~*any statutory modification or re-enactment thereof for the time being in force.*~~   386
~~*Unless the parties agree upon a sole arbitrator, one arbitrator shall be*~~   387
~~*appointed by each party and the arbitrators so appointed shall appoint a third*~~   388
~~*arbitrator, the decision of the three-man-tribunal thus constituted or any two of*~~   389
~~*them, shall be final. On the receipt by one party of the nomination in writing of*~~   390
~~*the other party's arbitrator, that party shall appoint their arbitrator within*~~   391
~~*fourteen days, failing which the decision of the single arbitrator appointed shall*~~   392
~~*be final.*~~   393

~~*For disputes where the total amount claimed by either party does not exceed*~~   394
~~*the amount stated in Box 25** the arbitration shall be conducted in accordance*~~   395
~~*with the Small Claims Procedure of the London Maritime Arbitrators*~~   396
~~*Association.*~~   397

~~*(b) This Charter Party shall be governed by and construed in accordance with*~~   398
~~*Title 9 of the United States Code and the Maritime Law of the United States and*~~   399
~~*should any dispute arise out of this Charter Party, the matter in dispute shall be*~~   400
~~*referred to three persons at New York, one to be appointed by each of the*~~   401
~~*parties hereto, and the third by the two so chosen; their decision or that of any*~~   402
~~*two of them shall be final, and for the purpose of enforcing any award, this*~~   403
~~*agreement may be made a rule of the Court. The proceedings shall be*~~   404
~~*conducted in accordance with the rules of the Society of Maritime Arbitrators,*~~   405
~~*Inc.*~~   406

~~*For disputes where the total amount claimed by either party does not exceed*~~   407
~~*the amount stated in Box 25** the arbitration shall be conducted in accordance*~~   408
~~*with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators,*~~   409
~~*Inc.*~~   410

~~*(c) Any dispute arising out of this Charter Party shall be referred to arbitration*~~   411
~~*at the place indicated in Box 25, subject to the procedures applicable there. The*~~   412
~~*laws of the place indicated in Box 25 shall govern this Charter Party.*~~   413

~~*(d) If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply.*~~   414

~~*(a), (b) and (c) are alternatives; indicate alternative agreed in Box 25.*~~   415

~~***Where no figure is supplied in Box 25 in Part I, this provision only shall be void*~~   416
~~*but the other provisions of this Clause shall have full force and remain in effect.*~~   417

### Clause 20. Freight payment

95 per cent of freight to be paid within 7 banking days after completion of loading and signing/releasing Congen Bills of Lading edition 1994 marked "Freight payable as per C/P dated 6th of September, 2007" to Owners' nominated bank account.
Freight to be discountless, non-returnable vessel and/or cargo lost or not lost. Owners to pay disbursement accounts both at loading and discharging ports. Balance of freight to be settled within 30 days upon receipt of all supporting documents together with settlement of demurrage/despatch.

### Clause 21. Notices

Owners/Master to give: on sailing from last port prior to port of loading and 10/7/5 days provisional notices and 72/48/24 hours definite notices of ETA at the loading port, specifying in the 5-days notice the exact quantity to be loaded, estimated laden draft and stowage plan to the Charterers and Agent at the loading port. Owners/Master to give: on sailing from the loading port/20/15/12/9/6/4 days provisional notices and 72/48/24/12 hours definite notices of ETA at the discharging port, specifying in the 4-days notices the exact quantity to be discharged, estimated arrival draft and cargo plan to the Charterers and Agents at the discharging port.

### Clause 22. Agents

| Weipa : | Dneprobugskiy : |
|---|---|
| Barwil Agencies | Pacific Maritime Ltd. |
| Tel : 61-070 697203 | Tel: (380-512)500401/2 |
| Fax : 61-070 697221 | Fax: (380-512)500403 |
| Tlx : AA 48808 | Tlx: (680) 272083 PILOT UX or 272087 PACMA UX |

### Clause 23. Loading and Discharging

For loading and/or discharging purposes the master of the vessel shall fit the vessel to the loading and/or discharging berths/installation by ballasting or deballasting tanks, if necessary, provided port authorities permit. Furthermore, the vessel is to warp/shift along the berth/wharf if and whenever required to do so by shippers/receivers and/or their agents. The crew of the vessel shall handle lines only on board the vessel to warp and/or shift the vessel alongside the loading and/or discharging berth/installations provided shore regulations permit. The vessel's crew shall open and close hatches as required by shippers/receivers and/or their agents at Owners expense, time used for opening/closing of hatches to count, provided shore regulations permit, if not, same to be for Charterers' account. The master shall cover the hatches of each hold as soon as loading into that hold has finished. If weather is inclement or wet the master shall have all hatches closed when loading or discharging has finished for the day. During rain and/or strong wind the master shall cover up all hatches into or from which loading or discharging is not in progress. The vessel to provide sufficient lights as on board the vessel for night work free of expense to Charterers/Shippers/Receivers.

Owners shall be responsible for the cargo beginning from the moment the cargo crossed the vessel's railings at the loading port or place, until the moment it crosses the railings at the discharging port or place.

5

### Clause 24. Overtime

Overtime to be for the account of the party ordering same. If overtime is ordered by port authorities then same to be for Charterers' account. Officers and crew overtime is always for Owners account.

### Clause 25. General Clause Paramount

This Bill of Lading shall have effect subject to the provisions of any legalization relating to the carriage of goods by sea, which incorporates the rules relating to Bills of Lading contained in the International Convention dated Brussels, 25th of August, 1924 and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such term shall be void to that extent, but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from, or limitation of, liability.

### Clause 26. Lay-time

a) cargo to be loaded at the rate of 40,000 metric tons per weather working day, Sundays and holidays included, excluding Super/High holidays. Cargo to be discharged at the rate of 10,000 metric tons per weather working day Sundays and holidays included, excluding Super/High holidays. Lightening for Owners' account at maximum USD 9.50 per metric ton at the rate of 4,000 metric tons per weather working day Sundays and holidays included. At loading and discharging ports and lightening place Master may tender Notice of Readiness at any time day/night Sundays and holidays included, excluding Super/High holidays, after the vessel arrived at the port of loading/discharging, customs cleared and in free pratigue and in all respects ready to load/discharge the cargo.
Time to count 12 hours after Notice of Readiness is validly tendered and accepted unless Loading/discharging commences sooner in which case actual time used before commencement of lay-time to count.

b) if the vessel is arriving prior to the agreed laydays Master may tender Notice of Readiness when the vessel is berthed or after commencement of laydays whichever occurs sooner.

c) if the loading and/or discharging berth is not available on the vessel's arrival at the loading and/or discharging port or so near thereto as she may be permitted to approach, the Master has the right to give Notice of Readiness on arrival at such waiting place whether in berth or not, whether at port or not, whether in free pratique or not, whether customs cleared or not, provided the Master warrants that the vessel is in fact in all respects ready to load and/or discharge the cargo and free pratique is granted before or upon berthing. If free pratique is not granted, time not to count from time of rejection until time free pratique is granted. Actual time used thereafter in moving from the place of waiting to the berth, berthing and opening the hatches shall not count as lay-time or time on demurrage. If after berthing the vessel is found not to be ready in all respects for loading and/or discharging actual time lost from the discovery thereof until she is in fact ready to load and/or discharge the cargo not to count as lay-time or time on demurrage. Waiting time due to navigational reasons such as, but not limited to, weather conditions, awaiting daylights, tides, awaiting pilots or tugs or ice-breaker etc. shall not count as lay-time or time on demurrage.

6

d) if during loading or discharging the vessel's master or the port authority orders the
vessel out of the berth for reasons of safety due to cyclone, fire, explosion or imminent
threat thereof, the period of time from cessation of loading or discharging until the
vessel is again alongside the berth, with hatches open and in all respects ready to
recommence loading or discharging shall not count as lay-time or time on demurrage.
Charterers shall assist the Owners in attempting to obtain priority for their vessel at
the loading or discharging berth (as the case may be) after such occurrence.
Opening/closing of vessel's hatches as required by Port Operator shall be for Owners'
account and time used not to count.

e) on arrival alongside the berth at loading port the ship has the ballast tanks either empty
or pressed up, in order to facilitate draft survey prior to loading, the ship de-ballasts as
required by Shippers to permit full and timely use of loading equipment capacity
the ship is capable of de-ballasting at a rate required by Shippers and in all cases will be
capable of de-ballasting within 20 hours, and of completing loading the cargo requested
by the vessel within 23 hours

f) any time lost during loading or discharging due to vessel's inability to load and/or
discharge the cargo due to any defect or default of the vessel, deficiency and/or
default of the vessel's personnel including inability of the vessel to ballast or deballast
during loading or discharge shall not count as lay-time or time on demurrage.

g) time used for draft checks ordered by master during loading and time used for draft
survey after completion of loading not to count as lay-time or time on demurrage.

h) lay-time or time on demurrage shall cease on completion of loading and
discharging.

i) laytime at loading and discharging ports to be non-reversible.

**Clause 27. P&I Club**

Owners P & I Club: TBA

**Clause 28. Performing vessels**

Performing vessels to be:
singledeck, selftrimming, steelfloored, gearless
bulkcarriers with engine/bridge aft,
maximum 20 years
classed highest Lloyds or equivalent,
fully P.& I. covered,
fully ISM certified,
fully ITF fitted,
in all respects ready to trade Australia and equipped with Australian serviceable ladders,
always subject to Right Ship approval including ISPS Certificate.

Performing vessels to be in every way suitable to load, carry and discharge cargo of bauxite.
Performing vessels to be P&I Club covered with P&I Club being member of the international
group of P&I Clubs and H&M insured throughout the whole voyage, performing vessels to
be fully ITF fitted. Prior to loading the performing vessel's holds to be tendered free of rust
and scale, washed, swept and clean to Shippers' satisfaction for the cargo of bauxite in bulk.

7

Performing vessels to be suitable for grab discharge and to be clear of sweat battens. Owners confirm that performing vessels will have no center line beams/bulkheads (girder), no fittings or other obstructions in holds. No cargo to be loaded in deeptanks, bunkers or other compartments not easily accessible to grabs. Any extra expenses or time lost in excess of normal grab discharge to be for owners' account. Deeptanks, tunnels and all other projections within vsl's holds are to be protected against damage by grabs, failing which owners/vsl to be responsible for any damage to vsl's holds.

Owners confirm that they have checked loading and discharging ports and have satisfied themselves that performing vessels will be suitable in all respects for this trade in these ports.

### Clause 29. Arbitration

The Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause. The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced. The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and give notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator. In cases where neither the claim nor any counterclaim exceeds the sum of US$ 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time, when the arbitration proceedings are commenced.

### Clause 30. Extra Insurance

Extra insurance, if any, due vessel's age/class/ownership to be for Charterers' account.

### Clause 31. Demurrage and Despatch

Demurrage and despatch at port of loading and discharging to be settled directly between Shipowners and Charterers as per time sheets established on the basis of Statements of Facts and N.O.R. co-signed by the representatives of shippers and receivers. It is to be settled within 30 days upon receipt of all documents as per the Charter Party. Despatch at half demurrage rate to be paid by Owners for lay-time saved at loading and discharging ports.

## Clause 32. I.S.M.

During the currency of this Charter Party the Owners shall procure that the vessels and the "Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant document of compliance (DOC) and Safety Management Certificate (SMC) to the Charterers, except as otherwise provided in this Charter Party. Any loss, damage, expense or delay caused by failure on the part of the Owners or the "Company" to comply with the ISM Code shall be for the Owners' account.

## Clause 33. Ice Clause

Under no circumstances the vessel shall be requested to force ice, but to follow ice-breaker only in broken ice.

## Clause 34. Bills of Lading

In the event when original Bill(s) of Lading is not available at discharging port, Owners to allow discharging against Charterers' corporate Letter of Indemnity issued in accordance with Owners' P&I Club wording. The original Bill(s) of Lading to be surrendered as soon as possible, but not later than 15 days after completion of discharging. Letter of Indemnity to be returned to Charterers or to be declared as null and void by Owners.

## Clause 35. Nomination

Shipments fairly evenly spread within 2008.

Charterers to nominate each shipment latest 30 days prior to first day of respective lay/can, which to have 10 days spread. Intended performing vessel to be nominated by Owners latest 15 days prior to first day of Charterers' lay/can and to be approved by Charterers within 48 hours after nomination.

Owners have the right to substitute intended vessel latest 10 days prior to her ETA to loading port. Final performing vessel to load approximately the same quantity of cargo as intended performer and to be approved by Charterers within 48 hours after nomination. The ship can be rejected if she does not comply with Charterers' requirements, if she has previously caused significant difficulty at the port of loading in respect of loading or port movements, or if she has not been accepted by Right Ship.

Owners should advise in their nomination:

- the name of ship
- the estimated date of her arrival at port of loading
- the type of vessel, flag, year of built, deadweight, fully laden draft,
  length overall, beam, estimated draft on arrival,
  number of holds/hatches, sizes of holds/hatches and location of hatches
- classification Society, P&I Club, H&M Underwriters,
- expected quantity of cargo to be loaded

Owners to answer Shippers' questionnaire and Right Ship vetting questionnaire with nomination of performing vessel.

# Exhibit B

*Griffiths Declaration*

```
==================================================================
   Message Printed  on 14-08-2008 14:06:11  by MLI     RefNum: 16649678
   From/To: Morten Riis/E-Mail
==================================================================
```

Mikkel/Geir

Please find below amended recap to reflect the 43 cgos of 60,000mt 10pct each, as agreed, at the same time Mikkel could you please provide us with you standard calculation (freight matrix) that should b used for agreeing the freight rate for optional shipments. Tks

Re: Weipa / Porto Vesme - Coa 2008 - cp date 30th November;

I'm pleased to forward clean recap with cp date 30th November 2007;

Tonnage to be nominated by D/S Norden
Tonnage gless, self-trimming bulk carrier with engine/bridge aft

- TBN max 15 years, if 15 to 20 years same subject to
  chrtrs approval


Acc Rusal or nominee

- Weipa/Porto Vesme
- 43 cargoes of each 60,000 mt 10 pct moloo in owners option
  + UP TO 240.000 ts in chopt, to be shipped in upto 4 full and complete shipments,
(nomination clause to be agreed)
  Freight rate to be based on 4TC average on the day of nominating performing vessel
plus the day before and the day after ( i.e. average of the 3
  days), owners to provide a standard calculation to be used for agreeing the freight
rate
- CoA period: 1st Jan / 31st Dec, 2008
  Cargoes to be FES during this period
- 1sb Weipa / 1sb Porto Vesme
- 2-4 cgos per month (for main qty) - shipments schedule to be mutually agreed
- chrts to nominate 7-days spread lay/can for each shipment latest 25 days prior to
laydays
- frt rate US$ 64,65 pmt FIOT 1/1
- 40,000/12,000 SHINC, 12 hrs tt bends
- dem US$ 62,000 /pr dhd lts bends
- otherwise bss Norden/Rusal CP 31/10/07 with
  logical amendments only and technical terms for Weipa and Porto Vesme
- 3,75 pct ttl com for division to be paid by owner
End

Thank you very much for your support.


Thanks + Brgds

Panamax Bulk As
Drammensveien 123
N-0213 Oslo
Norway
Tel:   +47 2301 4597
Fax:  +47 2301 4596
E-Mail: chartering@panamaxbulk.com
E-mal: tonnage@panamaxbulk.com (all tonnage positions)


Mob:  +47 9325 5050
Msn:  geir_ringdal@hotmail.com


--------------- End of Message ---------------

# Exhibit C

*Griffiths Declaration*

## Panamax Bulk

**From:** PanamaxBulk As [chartering@panamaxbulk.com]
**Sent:** 1. desember 2007 19:48
**To:** Norden Chartering Panamax (DK)
**Subject:** Trombetas / Aughinish - Coa 2008 - clean recap
**Attachments:** _AVG certification_.txt

Mikkel+Anders/Geir

Re: Trombetas / Aughinish Coa 2008 - cp date 30.11.07

Pleased to forward clean recap with cp date 30.11.07

Acc Rusal or nominee
Tonnage to be nominated by D/S Norden
Tonnage gless, selftrmming bulkcarrier with engine/bridge aft

Trombetas/Aughinish
------------------------
- TBN max 15 years, if 15 to 20 years same subject to
  Aughinish Questionnaire
- 1.340.000 ts bulk bauxite - each 50,000 mt 10 pct moloo in owners option (last
shipment always to be full and complete)
- Up to 200.000 ts in chopt, to be shipped in upto 4 full and complete shipments,
(nomination clause to be agreed)
  Freight rate to be based on 4TC average on the day of nominating performing vessel
plus the day before and the day after (i.e. average of the 3
  days), owners to provide a standard calculation to be used for agreeing the freight
rate. Optional cargoes to be shipped in the period 1.4.08-31.12.08
  in chopt, i.e. none of the optional cgos to be shipped in 1st quarter 2008
- CoA period: 1st Jan / 31st Dec, 2008
  Cargoes FES during this period, about 2 per month
- 1sb Trombetas(were chrts to gtee 37 ft fw) /1sb Aughinish
- chrts to nominate 7-days spread lay/can for each
  shipment latest 25 days prior to laydate
- frt rate US$ 55.50 pmt FIOT 1/1
- 28,000/15,000 SHINC, 12 hrs tt bends
- Demurrage to be based on 4TC average on the day of nominating final performing
vessel plus the day before and the day after (i.e. average of the
  3days),  pdpr / dhd lts bends
- otherwise bss Norden/Rusal CP 31/10/07 with
  logical amendments only and technical terms for Trombetas
- 3,75 ttl com for division to be paid by owners
end

Thanks vmuch for your

Thanks + Brgds

Panamax Bulk As
Drammensveien 123
N-0213 Oslo
Norway
Tel:   +47 2301 4597
Fax:   +47 2301 4596
E-Mail: chartering@panamaxbulk.com
E-mal: tonnage@panamaxbulk.com (all tonnage positions)

Mob:   +47 9325 5050
Msn:   geir_ringdal@hotmail.com

1

# Exhibit D

*Griffiths Declaration*

IN THE MATTER OF THE ARBITRATION ACT 1996
AND
IN THE MATTER OF THREE ARBITRATIONS HEARD
CONCURRENTLY THEREUNDER

BETWEEN:

## PANAMAX BULK A/S

Claimant / Brokers

and

## DAMPSKIBSSELSKABET NORDEN

Respondent / Owners

(1) COA WEIPA / DNEPROBUGSKIY 6/9/07
(2) COA WEIPA / PORTO VESME 30/11/07
(3) COA TROMBETAS / AUGHINISH 30/11/07

. . . . . . . . . . . . . . .

## AWARD

. . . . . . . . . . . . . . .

WHEREAS the Respondent as shipowner entered into three Contracts of
Affreightment ("COA's") with RTI Ltd of Jersey as charterer, as follows:

    (i)    a COA for the Weipa / Dneprobugskiy route dated 6/9/07;
    (ii)   a COA for the Weipa / Porto Vesme route dated 30/11/07;
        and
    (iii)  a COA for the Trombetas / Aughinish route dated 30/11/07.

WHEREAS by clause 29 of each of the three COA's, any dispute arising
out of or in connection with the relevant contract was to be referred to
arbitration in London in accordance with the provisions of the clause and
the provisions of the Arbitration Act 1996.

1

WHEREAS the Claimant, as broker, negotiated and concluded the said COA's on the Respondent's behalf and claimed to be entitled to commission on all freight, dead-freight and demurrage earned under the said COA's, or which would have been earned thereunder, but for the termination of the Weipa / Porto Vesme COA, both for itself (as regards a claim for 1.25% commission) and for others involved or allegedly involved as brokers in the negotiating and concluding of the said COA's (as regards a claim for an additional 2.5% commission).

WHEREAS the Claimant commenced three separate arbitrations in respect of the claims for commission, in each case appointing Mr William Robertson as its arbitrator; and in each case the Respondent appointed Mr Alistair Schaff Q.C. as its arbitrator in respect of its defence to the Claimant's claims and its counterclaims for the recovery of commission already paid to the Claimant; and in each case Mr Bruce Harris was appointed as third arbitrator and chairman.

WHEREAS it was agreed and ordered that the three arbitrations should be heard and determined concurrently; and accordingly it is expedient and appropriate and it was agreed that a single Award and accompanying Reasons should be issued in respect of all three arbitrations (although the Claimant's agreement was expressly on the basis that the references remained separate as regards the ability (or inability) of Norden to set-off amounts paid between separate contracts and references).

WHEREAS it was common ground between the Claimant and the Respondent that the Claimant's claim for commission (both as regards its 1.25% claim in its own right and as regards the 2.5% claim for others) fell within the scope of the arbitration agreement contained in the respective COA and the arbitration reference commenced pursuant thereto.

WHEREAS the parties were represented by solicitors and counsel at the oral hearing of this matter which took place in London between 18th – 22nd January 2010 and on 3 February 2010.

NOW WE, the said William Robertson, Alistair Schaff Q.C. and Bruce Harris, having taken on the burden of these three concurrent references and having carefully and conscientiously considered all the evidence and all the submissions made to us, DO HEREBY MAKE, ISSUE AND PUBLISH this our AWARD, which is FINAL save as to issues of costs, as follows.

(1) WE AWARD AND ADJUDGE that the Claimant is not entitled to payment of any commission under the Weipa / Dneprobugskiy COA dated 6/9/97.

(2) WE AWARD AND ADJUDGE that the Claimant is not entitled to payment of any commission under the Trombetas / Aughinish COA's dated 30/11/07.

(3) WE AWARD AND ADJUDGE that the Claimant is not entitled to payment of any commission under, or any damages in relation to the Weipa / Porto Vesme COA dated 30/11/07.

(4) WE AWARD AND ADJUDGE that the Respondent is entitled to repayment of all commission previously paid under the Weipa / Porto Vesme and Trombetas / Aughinish COA's dated 30/11/07, less deduction (by way of equitable set-off) for the unpaid commission which would otherwise have been due to the Claimant under the Weipa / Dneprobugskiy COA dated 6/9/97, thereby entitling the Respondent to repayment of the net amount of US$1,366,566

(5) WE DIRECT that the Claimant shall forthwith pay to the Respondent the net amount of US$1,366,566 together with interest thereon at the rate of 4% per annum compounded at three-monthly rests from 5 September 2008 until the date of payment.

(6) WE RESERVE all questions of costs to our continuing jurisdiction.

GIVEN under our hands at the seat of these arbitrations in London this 17 day of March 2010.

William Robertson

Alistair Schaff Q.C.

Bruce Harris

3

IN THE MATTER OF THE ARBITRATION ACT 1996
AND
IN THE MATTER OF THREE ARBITRATIONS HEARD
CONCURRENTLY THEREUNDER

BETWEEN:

PANAMAX BULK A/S

Claimant / Brokers

and

DAMPSKIBSSELSKABET NORDEN

Respondent / Owners

(1) COA WEIPA / DNEPROBUGSKIY 6/9/07
(2) COA WEIPA / PORTO VESME 30/11/07
(3) COA TROMBETAS / AUGHINISH 30/11/07

REASONS
(forming part of and incorporated in Award)

## INTRODUCTION

1.  These three arbitrations, heard concurrently, concern claims for
    commission by the Claimant brokers ("Panamax Bulk") against the
    Respondents ("Norden").

2.  The claims arise in relation to three separate contracts of
    affreightment ("COA's") as follows:

    a.  a COA dated 6/9/07 in relation to voyages from Weipa
        (Australia) to Dneprobugskiy (Russia) ("the September 2007
        COA");

    b.  a COA dated 30/11/07 in relation to voyages from Weipa
        (Australia) to Porto Vesme (Sardinia) ("the Porto Vesme
        COA"); and

1

c. a COA dated 30/11/07 in relation to voyages from Trombetas (Brazil) to Aughinish (Ireland) ("the Trombetas COA").

When the context permits, we refer to the Porto Vesme and the Trombetas COA's together as "the November 2007 COA's."

3. Panamax Bulk's primary claim is for 3.75% commission in relation to freight or dead-freight earned under each of the three COA's; in the alternative, it claims 1.25% in relation to freight or dead-freight earned under each of the 3 COA's; and it also claims damages in relation to commission to which it is alleges Panamax Bulk would have been entitled had Norden not terminated the Porto Vesme COA. For its part, Norden not only denies liability for any sums claimed by Panamax Bulk but counterclaims for sum already paid by way of commission in relation to the Porto Vesme and Trombetas COA's.

4. The 3.75% claim is not brought on behalf of Panamax Bulk alone. Panamax Bulk accepts that, for its part, it was only entitled to 1.25% commission, a rate which is entirely consistent with the usual rate of commission payable to a broker in its position at the material time. The claim for the balance of the 3.75% commission, ie 2.5%, is made for another entity, described as Natica Shipping Ltd ("Natica"). It would be fair to say that the intended ultimate beneficiary of this 2.5% is somewhat shrouded in mystery and is unlikely to have been Natica itself. Natica is not a party to these references and makes no claim in its own right. The sole claimant is Panamax Bulk who appears to have been funded for the purposes of bringing the present claims by those 'principals' standing behind Natica.

5. The relevant COA's each contain London arbitration clauses. The charterers in each case were RTI Ltd of Jersey, affiliates of the Rusal group, a Russian commercial entity which is one of the largest alumina producers in the world and therefore has a significant demand for bauxite. Rusal is not party to these references.

6. Panamax Bulk brings the present claims, both for itself and for Natica or Natica's (undisclosed) 'principals,'

2

a. under the Contracts (Rights of Third Parties) Act 1999 ("the 1999 Act"); and/or

b. under an independent contract said to arise between itself and Norden.

7. The former claim raises issues as to the application and effect of the 1999 Act; the latter claim raises issues of substance but not, in the light of Norden's very constructive approach to this topic, issues of jurisdiction. It is accepted by the parties that we have jurisdiction to determine this independent claim.

8. This arbitration raises some very difficult issues of fact and law. Serious allegations, including allegations of dishonesty, are levied against Panamax Bulk. Whilst we have received oral evidence from a number of witnesses, there is no evidence from Rusal; and disclosure of material documents, particularly as regards communications between Natica and Rusal, is very limited. As in many other cases, the oral evidence that has been tendered is liable to be, and appeared to be affected by a process of reconstruction and by a degree of hindsight, in the light of the dispute which has arisen subsequently. We have had to pay particular regard to the extent to which the oral evidence is consistent with the contemporary documents. We have also had to set out the evidence much more thoroughly than would ordinarily be the case.

9. What follows are, first, our detailed findings on the evidence, in broadly chronological sequence; and secondly, our conclusions on the various issues that arise, in the light of our findings and in response to the various submissions of the parties.

## THE FACTS

### Background facts

10. Panamax Bulk is owned and controlled by Mr Morten Riis, from whom we heard oral evidence. He is a very experienced shipbroker. He had previously worked at Fearnleys and latterly at Freight Investor Services ("FIS").

11. In the course of his business, Mr Riis became acquainted and in due course friendly with Mr Dmitry Osipov, from whom we also heard oral evidence, by videolink. They had a close business

3

relationship; that business relationship developed into one of friendship such that they celebrated each other's birthdays. Mr Osipov owned and controlled Natica and ultimately as much as 60% of Panamax Bulk's revenue may have emanated from Natica-sourced business.

12. It quickly became apparent to Mr Riis that Natica was not just the broker for, but really an extended trading arm of Rusal. Rusal did not appear to have any significant chartering department of its own but did all its chartering through Natica. It appeared to Mr Riis, with justification, that if he wanted to do business with Rusal, he had to go through Natica. Similarly, it appears to have been common knowledge in the market that anyone who wished to deal with Rusal had to go via Natica.

13. In this regard, Natica had an exclusive Brokerage Agreement dated 7 October 2003 with Rusal which provided that *"with effect from the date of this Agreement, [Rusal] hereby appoint [Natica] to act as their sole and exclusive Shipbrokers"* and Rusal *"shall correspond with any and all shipowners ... via [Natica] only. [Rusal] undertake to ask [Natica's] prior approval of any direct contact with [Owners], only when they feel it to be absolutely vital for the proper chartering, insurance and operational purposes."* The Brokerage Agreement contained no express provision for remuneration. It is unclear to us how, when and in what terms Rusal agreed that Natica should be remunerated but presumably it must have been agreed by Rusal that Natica would be remunerated for its services.

14. Whilst Mr Riis was at FIS, he broked a number of spot fixtures with various shipowners in which Rusal nominees were the charterers. In each case, he dealt with Natica on behalf of Rusal and had no direct dealings with Rusal.

15. In 2006, Mr Riis broked a number of spot fixtures between Rusal nominees and Norden. Once again, he dealt with Natica on behalf of Rusal and had no direct dealings with Rusal.

16. On 31 October 2006, the first COA (for three bauxite cargoes) was concluded between Norden and a Rusal company, Mont-Cervin. The broking of this fixture was effected by Mr Riis (at FIS) and by Natica.

4

17. Norden is a significant Danish shipowner, with offices worldwide. We heard oral evidence from Mr Christiansen, the General manager of Panamax chartering in 2006-2008; from Mr Fruergaard, the then senior chartering manager on the Pacific desk; and Mr Hansen, the then senior chartering manager on the Atlantic desk. We are in no doubt that Norden was keen to obtain Rusal business.

18. The development of this early business between Norden and Rusal, via Mr Riis, culminating in the 31/10/06 COA, led to a meeting at the Park Hyatt hotel in Hamburg on 3 November 2006. That meeting was attended (inter alia) by Mr Christiansen, Mr Riis, Mr Osipov and a Ms Galina Ardatova, a chartering manager at Rusal itself.

19. There is an issue between the parties as to what the commission arrangements for the 31/10/06 COA, and for subsequent COA's up until the September 2007 COA, were or were understood to be. Insofar as material, we conclude as follows.

20. Mr Riis, then at FIS but soon to start up Panamax Bulk, was (through his relevant company) understood to be acting as 'shipowners' broker'. This role (as 'shipowners' broker') is common ground between the parties to these arbitrations. However, it was never formulated in any written agreement; it was clearly not exclusive since Mr Riis regarded himself as free to offer Rusal business to other shipowners; and in one sense, in offering the business to a shipowner, such as Norden, it would appear that Mr Riis was really going out into the market to try and find an acceptable shipowner for Rusal in a role akin to that of an intermediate broker. Nonetheless, there is absolutely no doubt that Norden and Rusal regarded it throughout as Norden's obligation to pay FIS and subsequently Panamax Bulk a 1.25% commission for their services.

21. So far as Natica was concerned, there is also no doubt that, in the early stages, it was agreed, at least as between Rusal and Norden, that Natica would receive its commission from Rusal by way of a deduction from freight. It may be that for that reason, the fixture negotiations, the recaps and even the adapted pro-forma charterparties themselves occasionally referred to the presence of 'address commission.' For example, clause 20 of the 31/10/06 COA referred to *"95% of freight less address commission to be*

5

*paid within 7 banking days after completion of loading and release of bills of lading."* However, it was both Panamax Bulk's and Norden's evidence that this involved a certain degree of 'loose language,' and the reference to 'address commission' seems to us to be born out of the manner of its intended deduction and payment, rather than its ultimate beneficiary. Although it was Norden's evidence that it always understood that there was an 'address' element properly so-called, with Rusal taking 1.25% and paying Natica 1.25%, we do not believe that this could really have been Norden's understanding at the time. The recap for the 31/10/06 COA, which COA was used as the base COA for subsequent fixtures, and which was sent to Mr Christiansen, provided expressly for *"2.5 pct comm. to Natica including address;"* the recap for the next COA (22/12/06) provided for *"2.5 pct comm. to Natica"*; and in due course, when arrangements for the payment of commission were altered in November 2007, the instruction to pay Natica its 2.5% share directly elicited no surprise from Norden. It may well be that the 2.5% commission payable to Natica, which would be more than would be payable to a 'mere' broker, was justified and understood by all concerned as including an element akin to 'address' in that Natica was described as and understood to be performing the services of an extended trading arm of Rusal as well. All this may well have been discussed or confirmed at the meeting in Hamburg but is, in any event, pretty clear from the contemporary documents.

22. As we have already said, it is unclear what was actually agreed between Rusal and Natica in relation to the payment of Natica's remuneration and how and when and to whom any such remuneration was paid. Although it was asserted that it was Rusal who paid the freight less 2.5% commission and who then paid Natica the 2.5% directly, we have seen no evidence to that effect and we have doubts whether that was what really happened. It would appear that in relation to these early fixtures, an entity called Ocean Shipping Management Ltd ("Ocean") was purportedly introduced into the chain between Norden and Rusal, without Norden's knowledge, whereby Rusal appeared to charter the relevant tonnage, not from Norden, but from Ocean, at a higher rate of freight than that being charged by Norden. So far as one can see, the relevant Rusal – Ocean 'fixtures' contained no provision for commission. Ocean, who appears to have paid freight onwards to Norden, seems to have been remunerated, by the difference between the inwards and outwards freight rate, a difference which

was often significantly in excess of 2.5%. We have no idea whether this margin was ever appreciated by Rusal, nor who was behind Ocean; and although it is difficult to see how this arrangement could have worked without the involvement of Mr Osipov, his evidence was that he knew nothing about this 'internal matter' for Rusal. In any event, there is no suggestion and no evidence that Mr Riis knew anything about these Rusal and/or Natica arrangements on 'Charterers' side.'

The concluding of the September 2007 COA

23. The September 2007 COA provided, in broad outline, for the carriage of about 540,000mt of bauxite from Weipa to Dneprobugskiy in shipments of about 60,000 mt evenly spread within 2008.

24. The September 2007 COA was concluded in a similar way to previous COA's between Rusal's nominee as charterer and Norden, with all relevant negotiations being conducted by Natica (on Rusal's behalf) and Panamax Bulk, which Mr Riis had by now started up (on Norden's behalf). There is no dispute that Mr Osipov was authorised to negotiate and conclude this fixture on Rusal's behalf.

25. Under the September 2007 COA, as initially concluded, the agreed commission was 2.5% to Natica (to be deducted out of freight and paid by Rusal) and 1.25% to Panamax Bulk. The recaps provided for *"2.5% comm. your end"* to Natica, on behalf of Rusal; and *"2.5 pct address comm. pasts"* (ie past Panamax Bulk) to Norden. There is no issue that it was agreed, both on the basis of previous transactions and on the basis of the usual market expectations, that Norden would be paying Panamax Bulk the standard 1.25% commission. Moreover, and notwithstanding references to 'address commission,' we are satisfied – as already indicated - that at this time, Norden would have understood that the 2.5% was going to be paid to Natica.

26. Although 'subjects' were lifted on 6 September 2007, no formal COA was drawn up at that stage. Nonetheless, there was clearly a binding agreement between Rusal and Norden for the payment of commission as set out above. Under that original arrangement, it is common ground that Norden had agreed with Rusal and (if necessary) with Panamax Bulk that Panamax Bulk would be paid a

1.25% commission on freight, dead-freight and demurrage earned under the September 2007 COA.

27. Picking up the theme concerning what was actually agreed between Natica and Rusal in relation to this fixture, we have seen an email exchange between Ms. Olga Lebedeva (Mr Osipov's assistant at Natica) and Mr Roman Bolgarin, Commercial Director of Rusal's Alumina and Bauxite Division, dated 6 September 2007 concerning the September COA. Natica confirmed the fixture to Mr Bolgarin *"as per your authority;"* and Mr Bolgarin confirmed his acceptance thereof. Two things are interesting about that exchange: first, Mr Bolgarin is notified of a higher freight rate ($63.58 per mt) than that agreed to be payable to Norden ($62.95 per mt) – the difference is almost exactly 1%; secondly, there is no reference to any commission although one would have thought that Rusal would have expected that Natica, as its exclusive broker, was obtaining some remuneration for its services. Given that Norden had contracted to receive $62.95 per mt less 2.5% commission at the Rusal / Natica end, ie $61.38 per mt net of this 2.5% commission, at first sight it would appear that Natica (or its principals) was availing itself of a $2.20 per mt slice (ie the difference between the $63.58 per mt agreed by Mr Bolgarin for Rusal and the $61.38 per mt received net by Norden). This is approximately 3.5% of the gross Norden freight. The genuineness of this email was disputed by Mr Osipov, although there is nothing on its face to call into question its authenticity. In any event, however, we should emphasise that there is absolutely no evidence that Mr Riis was aware of any of this.

The Oldendorff 'Problem'

28. Objectively, it is clear that problems of some sort had developed in the Rusal – Natica relationship by the end of October 2007. Quite what those problems were is less easy to unravel.

29. Mr Osipov's explanation of the 'grudge' was that Mr Pavel Ovchinnikov, the director of alumina and bauxite at Rusal with effect from September 2007, had 'taken against' Mr Osipov because Mr Osipov had been involved in landing Mr Ovchinnikov in trouble with the Rusal Board of Directors for not increasing freight rates under a long-term COA between Oldendorff Carriers GmbH ("Oldendorff") and Rusal. That may or may not be the real explanation for what happened next.

30. Indisputably, however, proceedings were commenced in the US District Court (Southern District of New York) on 30 October 2007 in which a Rusal company sued Oldendorff, Natica, Mr Osipov and Mercury Shipping & Trading Ltd ("Mercury") for damages in excess of $450m. It was alleged that Mercury had agreed to provide vessels to Rusal under 4 COA's, including (coincidentally) a COA for the Weipa – Dneprobugskiy route dated 6 September 2007, and had repudiated those COA's. It was also alleged, however, that Mercury was part of or controlled by the Oldendorff group; that Mr Osipov was a director of Mercury; and that (in essence) Oldendorff, Mercury, Natica and Mr Osipov had all conspired to repudiate the Mercury COA's, to divert funds from Mercury and to profit at Rusal's expense. Mr Osipov refused to answer any questions which were properly put to him in cross-examination on the subject-matter of the US Complaint, including some fairly basic questions as to whether he was even a director of Mercury. Eventually, and in the face of our insistence that he should answer, he gave some very evasive answers on this subject. It is noteworthy that Mr Riis clearly believed that Mr Osipov had some connection with Oldendorff because it was that connection which (so Mr Riis asserted) explained certain 'P&C' exhortations which he had placed on a number of his exchanges with Mr Osipov, Mr Riis being concerned that his indications of rates on behalf of Norden or other shipowners should not find their way back to Oldendorff. We infer that Mr Osipov was much more closely involved in the transactions the subject-matter of the US Complaint than he was prepared to admit.

31. What exactly happened to this Complaint is also a matter of some doubt. It was asserted by Mr Osipov that it was speedily settled 'in a 30 minute meeting.' The proceedings generated a Rule B attachment on 30 October 2007 but the Civil Docket suggests that the proceedings terminated on 7 November 2007; quite on what terms is a matter of conjecture. There is no evidence that any further claim was pursued. Moreover, Mr Osipov's evidence was that Rusal entered into subsequent fixtures with Oldendorff and, through Natica, with other owners. In this regard, we have seen documents evidencing:

    a. a spot fixture, for a single voyage on the Weipa – Porto Vesme route, which was concluded on 30 November 2007 between Natica (for Rusal) and Panamax Bulk (for other

shipowners) in which there appears to be no question about Natica's authority and the recap provided *"3.75 ttl com for division to be paid by owner;"*

b. an Oldendorff – Rusal long-term COA dated 7 December 2007 for the Port Kamsar-Aughinish route which was negotiated by Natica on Rusal's behalf, although agreement thereto was confirmed by Rusal's board of directors. The recap sent to Rusal contained no express provision for commission. Panamax Bulk was not involved in this fixture (although Mr Riis told us that he had tried to obtain this business directly with Rusal, without the involvement of Natica); and

c. an MUR – Rusal long-term COA dated 10 January 2008 for the Port Kaiser – St.Petersburg/Murmansk/Kokkola route, likewise negotiated by Natica on Rusal's behalf, on a 'private and confidential and not to be disclosed' basis. Panamax Bulk was not involved in this transaction. MUR's brokers (Frachtcontor Junge) agreed (on MUR's behalf) to *"3.75% comm. for division (incl Frachtcontor) to be paid by Owners"*; the recap sent by Natica to Rusal contained no reference to commission.

32. Some of these transactions raise further questions. However, on the face of it, it does not appear that there was a total breakdown in relations between Rusal and Oldendorff or between Rusal and Natica.

33. The timing of when Mr Riis was first informed of the 'grudge' and when he was informed that the 'grudge' had been settled, and in what terms, are important. Mr Riis' evidence was that, in response to a telephone call made by Mr Riis to Mr Osipov, which could not have been earlier than 7 November, made in circumstances discussed further below, he was made aware by Mr Osipov of the fact that there was some sort of 'grudge' between Rusal and Natica which had arisen in relation to Oldendorff business. Mr Riis also said that he was told by Mr Osipov shortly thereafter that this 'grudge' had been resolved. The precise details and timing of this latter conversation are unclear. It was not until 13 November 2007 that Mr Riis was informed by email of meetings between Mr Osipov and Rusal which were professed to have settled the 'grudge;' and that the 'grudge' could have lingered on may explain

why Rusal was still thinking about the possibility of excluding Natica from future business, as indicated by Mr Bolgarin at the Copenhagen meeting of 19 November 2007 and referred to obliquely ("you know why") in Mr Osipov's email to Mr Riis of 20 November 2007. Indeed, in his oral evidence, Mr Riis suggested that it may not have been until December 2007 that he appreciated that the Oldendorff problem had been resolved.

The initial discussions about the Trombetas and Porto Vesme COAs

34. There had been some early communications between Natica and Panamax Bulk during the course of the summer in which Natica sought and Panamax Bulk gave various indicative or firm offers on behalf of other shipowners (such as Atlas or Armada) in relation to prospective Rusal cargoes on these routes. The communications related to possible COA's involving shipments spread over several years. Nothing firm had developed by late October 2007.

35. 'Out of the blue,' Mr Evgeniy Kudryavtsev, Rusal's newly appointed Chartering Manager, contacted Mr Christiansen of Norden on 31 October 2007, introducing himself and suggesting a direct meeting to discuss future business opportunities. The email was copied to Mr Roman Bolgarin, Rusal's Commercial Director of the Aluminium and Bauxite Division. Mr Christiansen's response suggested a direct meeting in Moscow on 11 December 2007. Mr Kudryavtsev then suggested an additional meeting in Copenhagen in mid November 2007. Arrangements for both meetings were put in place. So far, over a period of over one week, none of these communications were copied to Natica or to Panamax Bulk. These were the first ever direct communications between Rusal and Norden, ie which did not go through Natica or Panamax Bulk and, bearing in mind that the US Complaint was issued on 30 October 2007, the chronology and the non-involvement of Natica in these communications can not be a coincidence.

36. Amidst these 'introductory' communications, on 8 November 2007 Mr Kudryavtsev had invited Mr Freuergaard to quote directly for the Trombetas and Porto Vesme routes. This direct invitation, which did not come though and made no reference to Natica or Panamax Bulk, was likewise unprecedented. Mr Freuergaard's response, which may well have been discussed with Mr Christiansen, pointed out that *"as you know we normally do this*

*through Morten Riis, so do you want to continue this way, or do you prefer a direct dialogue??"* It was suggested by Panamax Bulk that this response was designed to cut Panamax Bulk out of the equation but we would not read it that way. In any event, Mr Kudryavtsev replied that *"in this situation we will stick to shipping traditions and will work via broker channel ie Mr Morton Riis."*

37. There was no reference to Natica in Rusal's invitation to quote; and no reference to any requirement that commission should be paid (directly or by deduction from freight) to either Rusal or Natica. It should be noted, however, that Mr Christiansen's evidence was that, bearing in mind that Panamax Bulk was to remain involved, at this stage Norden's freight calculations were done on the basis that 3.75% commission would still be paid. His evidence was that although Rusal had not indicated any requirement for 'address' commission of 2.5%, he assumed that that requirement would be maintained, as per all previous fixtures.

38. Quite separately, as it would appear, on 7 November 2007, Mr Kudryavtsev had also asked Panamax Bulk to obtain shipowner interest to quote for the same routes. This was the first direct invitation to obtain quotes for Rusal business which Mr Riis had ever received; hitherto, everything had come via Natica. Mr Bolgarin was copied in on the message – but Natica was not. The terms for which indications were sought were all *"sub chrts BOD approval."* It was obvious to Mr Riis that something strange was happening. He got in contact with Mr Osipov and, for the first time, learnt about the Oldendorff 'problem.'

An alteration to the commission arrangements

39. According to Mr Osipov, Mr Bolgarin had asked him at the end of September 2007 to alter the commission arrangements in relation to all shipments so that Natica henceforth collected its 2.5% commission from shipowners, not Rusal. However, Mr Riis does not appear to have been informed of this development until later. Although the relevant communication may have been preceded by a telephone call, it was not until 9 November that Mr Riis received written confirmation from Mr Osipov of the proposed change in commission payments. If the change really had been first notified to Mr Osipov in late September, it is hard to see why it was not communicated in writing to Mr Riis until 9 November 2007.

40. The proposed change was communicated to Mr Riis in the following terms.

*"Strictly P+C*

*Re RUSAL – 2.5% commission*

*As from the 1st November, 2007 we were requested to collect 2.5% commission to Natica from the owners. This is due to tax reasons connected with the internal financial changes in RUSAL. As you know RUSAL is also preparing for IPO, so they need to make some changes.*

*Re: COA C/P 06.09.2007 RTI/Norden*

*Please kindly obtain confirmation from Norden, that 2.5% commission under this CoA will be collected by them and payable to Natica against our respective invoices to Norden. Freight invoices should be issued accordingly showing full freight (95/5% without deducting commission)."*

41. It should be noted, therefore, that this email deals with one specific and existing fixture (the September COA) and also with other, unspecified business *"as from the 1st November 2007."* It would not appear that there were any ongoing long term fixtures which had already been agreed but which remained unperformed (other than the September 2007 COA) and this might explain why the September 2007 COA was singled out for special treatment. The first paragraph of the email clearly contemplates that there would be future business to which the new arrangement would apply.

42. A number of points can be made about this communication. First, the given explanation for the change in the mechanism by which Natica was to receive payment of commission does not stand up to even the most superficial scrutiny; to be fair, neither Mr Osipov nor Mr Riis appear to have attached any credibility to the explanation given or purportedly given by Rusal. The real reason clearly had nothing to do with any IPO or with the tax implications of any changes in structure. Standing back, it is also wholly unclear why Rusal should prefer to pay 100% of the gross freight, and leave the remuneration of its agent (Natica) to the whim of a foreign shipowner, rather than pay only 97.5% of the gross freight and ensure the proper and timely distribution of the commission to

13

its agent. The effect of the new arrangements would be to leave the details of the commission payments outside the control of, and beyond the knowledge of Rusal.

43. Secondly, the timing of this proposed change is also very curious. It is theoretically possible that the Oldendorff problem had been resolved by 9 November 2007 (the US proceedings had been terminated on 7 November) although whether all vestiges of the 'grudge' that had prompted such significant proceedings had also disappeared seems most unlikely. Moreover, the back-dating to 1 November 2007 is unexplained. It was not suggested by Mr Osipov that the revised commission arrangements were themselves part of the deal which resolved the US proceedings. Moreover, this email notification was sent to Mr Riis only one day after Rusal had invited Norden to quote directly for the Trombetas and Porto Vesme routes and only two days after Mr Riis had received the first direct invitation to quote for Rusal business and, appreciating that Natica appeared to have been cut out, had telephoned Mr Osipov to find out what was going on and had been told that there was a 'grudge.'

44. The matters do not rest with these exchanges. However, simply on the basis of this evidence, as at 9 November 2007, there is something very odd about the proposed change in commission structure, as advised to Mr Riis in this email. Although this is a subject to which we will return, in the light of all the evidence, our initial instinct is that this change in structure was unlikely to have been agreed by Rusal. First, it is unclear what, if anything, Rusal had <u>ever</u> known or agreed about the payment of commission (particularly bearing in mind the apparent role of Ocean in earlier fixtures and the terms of the email of 6 September 2007 between Rusal and Natica concerning the September 2007 COA itself). Secondly, no rational explanation was ever sought from or given by Rusal for the proposed change. Thirdly, it seems very strange that, if Rusal were to agree to this procedure, it would do so now, of all times, when it was entertaining such significant reservations about Natica's conduct.

45. On the other hand, we keep firmly in mind the fact that, although it was Norden's case that an honest broker in Mr Riis' position would have queried this instruction with Rusal, it was not part of Norden's case (as we understood it) that Rusal had not in fact authorised the change in commission arrangements and the

14

notification of such a change in commission arrangements <u>as</u> <u>regards those fixtures in respect of which Rusal had already agreed</u> <u>or might hereafter agree that Natica should receive commission.</u> In other words, Rusal's case was directed towards the proposition that any change in the commission structure contemplated by this email did not give a blanket authorisation that Natica would receive a 2.5% commission on all future transactions but only provided that Natica would receive a direct commission from owners on any future business in which Rusal <u>separately</u> agreed that Natica should receive commission. In essence, this particular line of argument was directed towards the commission arrangements for the November 2007 COA's, <u>not</u> the September 2007 COA.

46. Mr Riis forwarded Mr Osipov's email to Norden on 9 November 2007 in slightly different terms. He added reference to Panamax Bulk's 1,25% share (about which there can be no criticism). Under the first paragraph, he also added the words that *"we understood from RUSAL that for them there is no big problem whether to write 2.5% comm. to Natica plus 1.25% to Panamax Bulk or just to state brokerage comm. 3.75% total for division. Please kindly adv what you prefer."* Insofar as this may have implied that he had spoken to Rusal about this proposed change, he had done no such thing; he had only spoken with Mr Osipov.

47. An analysis of Mr Riis's conduct is a critical subject to which we shall return in the light of all the evidence. However, pausing as at 9 November 2007, Mr Riis had suddenly been confronted by the following developments: an unprecedented direct communication from Rusal, inviting the obtaining of offers from shipowners without the involvement of Natica, and prompting him to check up with Mr Osopov to find out why he had apparently been cut out of the chain; information from Mr Osipov that the 'Oldendorff problem' had caused a 'grudge' between Mr Osipov and Rusal; and notification from Mr Osipov that Rusal now apparently wanted Natica to receive its commission directly from owners, for reasons which did not stand up to scrutiny. Putting it neutrally, the acceptance of these revised commission instructions without checking directly with Rusal, with whom a direct line of communication had now opened up, raises significant question marks in our mind as to Mr Riis' conduct.

15

## The drawing up of the September COA

48. No COA had ever been drawn up and signed for the September COA. It is unclear to what extent drawn up COA's had ever been executed in the past (particularly bearing in mind the apparent intrusion of Ocean in the chain). In any event, by late November 2007, Mr Osipov was communicating to Mr Riis, and Mr Riis was communicating to Norden a pressing need for a signed charterparty for the September COA.

49. The explanation given by Mr Osipov was that Rusal urgently required the execution of a signed COA. We are not convinced that this was indeed the case; we believe that a more likely interpretation of events is that it was Mr Osipov who required the signed COA, particularly in the altered circumstances concerning the payment of commission. Quite clearly, whether those revised arrangements had or had not been agreed to by Rusal, something must have been happening behind the scenes such that Natica was no longer going to be receiving its remuneration from Rusal and needed to ensure payment from a different source. There is no obvious reason why Rusal would have wanted the executed charterparty, particularly one containing an express reference to the payment of commission when (on Mr Riis' and Mr Osipov's own evidence) Rusal apparently wanted to see no express reference to the payment of commission in any documents connected with the November 2007 COA's which were being negotiated at the same time; and we also have in mind the email of 6 September 2007 which would clearly have caused problems for the provision of a formal charterparty document containing different terms as to freight rates. It was said by Panamax Bulk that the executed version of the September 2007 COA was ultimately signed by Rusal, at a much later date. However, it is unclear who (if anyone) actually signed it on Rusal's behalf, the 'signature' appearing to be no more than an unidentifiable stamp, and when it was 'signed', and we cannot infer from that 'signature' that Rusal must thereby have been aware of and given its informed consent to the revised commission arrangements evidenced thereby.

50. The drawn up COA was prepared by Natica and sent to Mr Riis on 14 November 2007; and differing importantly from the 31/10/06 COA, which had been agreed (as usual) as the relevant template for the current fixture, this drawn up COA provided on its face for *"commission 3.75 per cent for division to be paid by Owners"* and

contained no provision for the deduction from freight of 2.5% 'address' commission in clause 20. Its terms accordingly reflected the revised arrangements as to the payment of commission to which Mr Osipov's email of 9 November 2007 refers.

51. Viewed from the perspective of the agreed recap for the September 2007 COA, the communication of this drawn up charterparty, first to Panamax Bulk and then to Norden, must have reflected an offer to vary the terms of the existing COA (as evidenced by the recap of 6 September 2007). Although the revised commission arrangements notified by Mr Osipov to Mr Riis on 9 November had been forwarded to Norden the same day, there is no evidence of any response from Norden to that communication prior to the meeting at Copenhagen on 19 November (see below). The draft proforma COA was sent directly to Mr Freuergaard on 16 November 2007, as well as to Norden's Shanghai office which was ordinarily responsible for checking the formal COA. At that stage, therefore, the original commission arrangements (with Norden to pay only 1.25% to Panamax Bulk) still stood.

52. On 24 November 2007, Mr Osipov advised Mr Riis that Mr Ovchinnikov had requested that a duly signed COA be presented latest Monday 26 November; as we have indicated, we doubt whether that was the real reason for requiring a signed COA. Mr Riis pressed Norden to comply with that deadline.

53. Norden's response was as follows. Mr Freuergaard advised Panamax Bulk, on 26 November 2007, that *"we have checked the recap and same has been found in accordance with the negotiations. Please draw up Charter Party in strict accordance with negotiations and recap. Once the charterparty has been drawn [up], you are hereby authorised to sign the Charter party on behalf of [Norden]"* (emphasis added). Notwithstanding the terms of that instruction, Panamax Bulk proceeded to sign the September 2007 COA in the terms drafted by Natica, including the revised provision for commission, which revised provision was different to that contained in the recap. In other words, Panamax Bulk committed Norden to pay 3.75% for division, rather than 1.25% to Panamax Bulk and leave Rusal to pay the commission to Natica by way of deduction from freight.

54. It was accordingly said by Norden at the hearing (but not previously pleaded) that there was no authorised agreement to the

17

terms of the signed September 2007 COA at all, at least as regards the revised provision as to *"commission 3.75 per cent for division to be paid by Owners"*. The logic of that argument, if correct, would be that the original terms as to commission prevailed, unvaried (i.e Norden only paying 1.25% to Panamax Bulk).

55. In his witness statement, Mr Freuergaard originally said that Norden had checked the draft charterparty (and not the recap), before authorising Panamax Bulk to sign it. This reference was only corrected in chief, on day 4 of the hearing, after the new argument based upon the literal reading of Mr Freuergaard's message had already surfaced. Be that as it may, we do not find it particularly surprising that Mr Freuergaard did not focus on the detailed terms of the proforma COA (it was not his job to do so and Panamax Bulk had indicated that it *"would have no problem to check/sign the charterparty here if we receive the authority from you"*). Objectively construing Mr Freuergaard's email of 26 November 2007, in isolation, Panamax Bulk was undoubtedly only expressly authorised to sign a proforma charterparty which was drawn up in strict accordance with the *"negotiations and recap."*

56. However, whatever the terms of Mr Freuergaard's authorisation email of 26 November 2007, Mr Freuergaard (and his colleagues at Norden) were well aware (by that time) of the proposed change in commission arrangements as regards the September 2007 COA; first, they had received the email of 9 November 2007; secondly, Mr Christiansen (who regularly liaised with Mr Freuergaard) had had discussions with Mr Riis involving commission, and the changes in payment structure envisaged in the email of 9 November, at a meeting in Copenhagen on 19 November 2007. Not only had no one at Norden communicated any objection to those revised commission arrangements but it was Norden's evidence that it regarded the notified change in the way in which the same overall amount of commission (ie 3.75%) was to be paid as a 'minor point.' It is reasonable to infer, and we conclude, that at the Copenhagen meeting on 19 November, at which the role of Natica had been discussed, it is likely that Norden indicated its consent to Mr Riis to the revised commission arrangements, as notified in the email of 9 November 2007.

57. One can well understand, therefore, why a broker in Panamax Bulk's position might legitimately have concluded that it was entitled to treat itself as authorised to sign a proforma charterparty

on Norden's behalf which reflected not merely the terms of the recap but also, as regards commission, the subsequent post-contractual change in the mechanism of payment of the commission. It needs to be emphasised that, at least as regards this COA, it is not disputed that Natica had been authorised to conclude the COA and that, as a matter of contract between Rusal and Norden (whatever the position may have been privately as between Natica and Rusal), Natica was entitled to receive commission of at least 1.25% and in fact (as we have already held) 2.5%.

58. Subject to the point addressed in the next paragraph, we would be minded to conclude on this issue that there was a binding variation to the September COA which provided for 3.75% commission to be paid by Norden for division between Panamax Bulk and Natica. In particular, we see no difficulty in concluding that Panamax Bulk had actual authority to sign the September COA in the terms agreed, either on the basis that *"the negotiations"* had continued, post recap, in relation to the mechanism by which commission was payable; or, on the basis that the term had been agreed by Norden and that agreement was not superseded by the literal reading of Mr Freuergaard's email of authorisation.

59. However, the one point which concerns us is a point which was not actually raised by Norden under this head but arises out of Norden's more general case on the evidence. It was not argued by Norden that there was no binding variation to the September COA because Rusal had not agreed to it, and it is far too late for any such case to be raised. However, it seemed to us that it could be said to follow from parts of Norden's case in other respects that Mr Osipov may have lacked actual or apparent authority on behalf of Rusal to put forward the revised commission arrangements in the terms of the email of 9 November 2007, even as regards the mechanism for payment of commission under the September 2007 COA; potential issues of actual authority might speak for themselves in the light of some of the points made above; and questions of Mr Osipov's apparent authority as regards the proposed variation of the September COA concerning commission would depend very much on the findings we make as to Mr Riis' state of knowledge and belief, to which we shall return.

60. We stress that these arguments were not run and can not now be run. Accordingly, we are proceeding on the basis that the revised commission arrangements were binding on Rusal in respect of the

September 2007 COA. In doing so, however, we make it plain that that follows from the way in which the case was put (or not put) by Norden. In particular, we do not consider that because, on that assumption, the email of 9 November must be treated as having been authorised by Rusal, that entitles a more favourable gloss to be put on the interpretation of Mr Riis' state of knowledge and belief than would otherwise have been the case. Panamax Bulk strongly pressed the submission that *"the first thing to say is that there undoubtedly was a change in commission structure authorised by Rusal"* as establishing the basis for an evidential argument that Panamax Bulk could not be complicit in any 'scam' involving the unauthorised payment of commission, particularly as regards the November 2007 COA's. We do not accept the logic of that submission in any event but, on the evidence, we are not prepared to make that finding of fact, albeit Norden has not challenged that proposition for the purposes of considering the enforceability of any variation to the September 2007 COA. We shall revert to this question later in these Reasons, to the extent that it is necessary to do so.

The concluding of the Porto Vesme and Trombetas COA's

61. After 9 November 2007, the position is that (i) Panamax Bulk had been requested by Rusal (directly) to obtain offers from interested shipowners; and (ii) as regards Rusal business with Norden, Panamax Bulk was firmly back in the broking chain, any earlier flirtation with the idea that Rusal and Norden might deal directly having been abandoned.

62. What is striking is that from the very earliest stage, all negotiations for the two COA's unfolded directly between Rusal and Panamax Bulk on behalf of the various interested shipowners, with Natica clearly not involved in the chain of communication at all. The only broker involved in the passing of quotes, offers and counter-offers (both as regards Norden and as regards other interested owners such as Atlas, Baumarine and Transfield) was Panamax Bulk.

63. What is also very striking is that although interested owners (both Norden and other shipowners) were invited by Panamax Bulk to offer and duly offered a 2.5% commission (usually referred to with other shipowners as "address" commission), in addition to Panamax Bulk's 1.25% commission, the offer of that 2.5% was never communicated to Rusal at all. Time after time, an interested

shipowner would offer terms to Panamax Bulk, including 3.75% commission; and those terms would be passed on by Panamax Bulk to Rusal in identical form, save that the reference to (and thus shipowners' offer to pay) "address" commission would be deleted. And in due course, when Rusal countered to Panamax Bulk, for onward communication, its proposed terms sought no commission on its side at all whereas when such counters were passed on by Panamax Bulk, a reference would be added to an apparent requirement on the part of Rusal to 3.75% commission. Messages to shipowners from Panamax Bulk also included, for the first time, the reference to *"account our direct charterers Rusal,"* as if to emphasise and make a virtue out of the directness of Panamax Bulk's relationship with Rusal.

64. Given that the 2.5% payable to Natica would affect the net bottom line being offered by Rusal and received by the respective shipowners, the failure to notify (i) Rusal of the proposed 2.5% commission being offered by shipowners and/or (ii) shipowners of the absence of any requirement on Rusal's part for a 2.5% (or any) commission, at any stage of these indications and negotiations, is extraordinary. The purported justification of this omission by Mr Riis, namely that the commission only had to be identified to its recipient (ie Natica) rather begs the question of whether Rusal had ever agreed that Natica should be entitled to receive this commission in relation to these would-be fixtures, as its agent, in the first place. Ultimately, Mr Riis appeared to suggest that Mr Osipov had asked him to make sure that no references to commission were included in the communications with Rusal, purportedly on the basis that this accorded with Rusal's wishes, although why Rusal apparently wished this to be the case was unclear.

65. Mr Osipov was not copied in directly on the relevant fixture indications and negotiations which took place between Rusal and Panamax Bulk. We reject both his explanation, and Mr Riis' explanation (both of them were somewhat coy on this subject) that this was a matter of Mr Osipov's administrative convenience due to his other work commitments or to the absence on holiday of his assistant. It is quite clear to us, particularly as the negotiations with Norden came closer to fruition, that Mr Osipov was regularly receiving separate emails from the ones sent by Mr Riis to Rusal, sometimes only minutes apart, in which the relevant terms and the commissions being offered by shipowners were being relayed to

21

him; Mr Osipov was similarly kept in touch by separate email from Mr Riis as regards terms being sought by Rusal. By this process, Rusal would not know that Natica was being copied in on the relevant exchanges; and Mr Riis must have appreciated that this separate line of communication was needed by Mr Osipov, precisely because Mr Osipov was not being kept 'in the loop' by Rusal.

66. On 13 November 2007, Mr Osipov advised Mr Riis that he had had attended a few meetings 'on top level' in Rusal. He stated that he had settled the Oldendorff 'grudge,' and that *"they don't have the intention to fix further business without Natica yet."* However, he also asked Mr Riis whether he had *"reserved 2.5% comm. to Natica as per old C/Ps, which is supported by our friends in Rusal now."*

67. Apart from indications given by various shipowners, matters had not greatly developed by the time of a meeting held in Copenhagen on 19 November 2007. It was attended by Mr Christiansen and Mr Hansen for Norden, Mr Riis and Mr Bolgarin and Mr Kudryavtsev of Rusal. It seems likely, and it is Mr Christiansen's own evidence, that the revised commission arrangements (as apparent from the email of 9 November 2007) were discussed between Mr Riis and Norden but we are not satisfied that they would have been discussed in front of Rusal. As previously indicated, we conclude that Norden would have given Panamax Bulk to understand that it had no problem with the 'minor issue' of the revised commission arrangements.

68. Natica was not represented at the Copenhagen meeting. Both Mr Riis and Mr Bolgarin gave Norden to understand that *"Natica may not always be involved in the future."* Although the matter was put more dogmatically in Norden's oral evidence, this is the way in which it was put in Mr Christiansen's witness statement and seems realistic. The reference to 'in the future' was clearly wide enough to embrace the putative Trombetas and Porto Vesme COA's, indications on which had yet to crystallise into firm, let alone concluded negotiations. This discussion appears to have generated a suggestion that commission might be reduced to 2.5% and however tentatively that was put by Mr Riis, it must explain why Norden's offer of 21 November 2007 was for *"2.5% ttl comm.."* This would leave a 1.25% 'address' element which raises further questions as to who it was thought might benefit from the same, if

Natica was not involved; perhaps it was thought that the 1.25% 'address' element, hitherto wrapped up in Natica's 2.5% share, would now go to Rusal but this is conjecture; and a further suggestion in Norden's evidence that it was mooted that Natica might stay involved but Rusal's address commission might be abandoned cannot possibly be correct. In any event, Panamax Bulk quickly persuaded Norden to requote on the basis of 3.75% total commission, thereby reinforcing in Norden's mind the notion that Natica was involved in these two COA's after all.

69. Mr Riis quickly reported back to Mr Osipov on the meeting. The content of his report is partly evident from Mr Osipov's response – *"What Roman said yesterday in respect of Natica is not official position of RUSAL, but mainly his wishful thinking."* This must be a reference to the possibility of cutting Natica out of future fixtures. Mr Osipov was similarly dismissive of Mr Bolgarin's *"private statement"* that the COA's *"would be fixed for one year 2008 and especially with the owners in his choice."* It appeared that Mr Osipov's desire for successive year COA's was not being shared within Rusal. On the other hand, Mr Osipov talked up his influence with Rusal, saying that *"so far we only agreed with his boss Pavel [Ovchinnikov] that 2.5% address commission should be collected from Natica from all the shipowners."* In our view, and in the light of later communications, this statement is likely to have been an inaccurate statement of Mr Ovchinnikov's actual position.

70. Mr Riis gave evidence that Norden were his preferred owners but even after the Copenhagen meeting, in late November, he was still passing on to Rusal offers from other shipowners, in each case omitting references to commission in the emails to Rusal but including them in (i) communications with the relevant shipowners and (ii) separate communications with Natica who he was still keeping in the loop.

71. So far as Norden was concerned, on 21 November 2007, Norden made a firm offer for the Trombetas and Porto Vesme routes at *"2,5 ttl comm."* As Mr Freuergaard explained, when agreeing to increase this, at Panamax Bulk's request, to 3.75% , it had offered 2.5% total commission *"as agreed on our meeting here in Copenhagen. I now understand from Morten that the situation has changed so that we need to offer in basis 3,75 ttl comm.."* Although the rates should have gone up, they were maintained *"in order to smooth things."* There was no explanation as to what if

23

anything had changed or why 3.75% was needed to get the business when, on the face of it, Rusal was not asking for commission on its side. Norden's offer was passed on to Rusal (Mr Bolgarin and Mr Kudryavtsev) without reference to commission (at 19.46 hours on 26 November) and to Natica with reference to commission (at 19.48 hours the same day).

72. On 28 November, Mr Osipov thanked Panamax Bulk *"for keeping your promise"*(quite likely, a reference to keeping him informed), made it plain that the decision as to who to fix with was the Board's although he had been invited to discuss the COA's with the Board and was *"fully co-operating with Roman and Evgeny on everything now"* and concluded: *"I would appreciate it if you would send me in copy what Norden replies to RUSAL today or let me know if they call."* Whatever Mr Osipov's stated involvement, he was self-evidently not been kept informed by Rusal of the detail of the negotiations.

73. On 29 November, Rusal confirmed Norden as 'preferable carrier' for the Porto Vesme route (but not yet for the Trombetas route) (this was contrary to Mr Osipov's information as to Rusal's likely preferences the previous day). The requested terms (at $62 rather than the quoted $67.95 per mt) made no reference to commission but were duly forwarded to Norden by Panamax Bulk with the 3.75% commission requirement added in; and this counter to Norden was also sent by Panamax Bulk to Natica, one minute later. There was haggling conducted exclusively in communications between Rusal and Panamax Bulk and Panamax Bulk and Norden, particularly about the freight rate, and finally, albeit subject to Rusal Board approval, the parties were fixed at $64.65 per mt for the Porto Vesme route by close of business on 29 November, with a provision for commission included in the confirmation sent by Panamax Bulk to Norden but not in the confirmation sent by Panamax Bulk to Rusal.

74. On the morning of 30 November 2007, Mr Osipov emailed Mr Riis to say that he would be speaking to the Board about the lifting of the subjects, asked Mr Riis to send him a copy of the *"full fixture recap at $64.65 pmt"* and sought confirmation *"for order sake that 2.5% comm. payable by owners to [Natica] or to the account as invoiced by Natica. The exact procedure shall be decided upon fully fixing. We should issue/sign a respective Side Letter to the CoA, which can be done between Panamax Bulk and Natica."* The

clear impression that Natica's involvement was to be kept secret from Rusal was also reinforced by the suggestion that *"as to the actual operation of this CoA, suggest it should be done by Panamax Bulk sending all correspondence with chrts in a separate copy to Natica, so we could follow it up with chrts on the phone or at personal meetings."* The only reason why a separate copy of any message was required, as opposed to 'cc-ing' the same message, must have been to avoid Rusal seeing that Natica was involved.

75. Board approval for the Porto Vesme COA was given in the afternoon of 30 November. It was communicated by Mr Bolgarin to Panamax Bulk and by Panamax Bulk to Norden. The Porto Vesme fixture was thereby concluded.

76. Later on the afternoon of 30 November, Norden's revised terms for the Aughinish COA were communicated to Rusal (again, without reference to commission). Board approval was communicated by Mr Bolgarin to Panamax Bulk and by Panamax Bulk to Norden. The Aughinish fixture was thereby concluded.

77. Clean recaps were subsequently prepared by Panamax Bulk, containing no reference to commission (as far as Rusal was concerned) and containing a provision for *"3,75 ttl com for division to be paid by owners"* for Norden's and Natica's eyes and ears only.

78. As a matter of legal analysis, the two COA's were concluded on 30 November, either between Rusal and Panamax Bulk (the latter acting on Norden's behalf, at least as regards the receipt of Rusal's clean acceptance in the form of the removal of the 'subject BoD approval'); or (if Panamax Bulk is to be viewed as an intermediate broker only) when Panamax Bulk (as agent for Rusal) communicated Rusal's clean acceptance to Norden. It seems to us that the former analysis is to be preferred; and in any event, neither side suggested that Panamax Bulk was Rusal's agent for any purpose.

79. Norden's offer(s) (as communicated to Rusal) contained no reference to commission; Rusal's counter-offer(s) and (in due course) acceptance (as communicated to Panamax Bulk) contained no reference to commission. The COA's so concluded were on the Gencon form which provided for 'brokerage commission' and we have no problem in accepting that it was implicit (if not explicit) in

these exchanges, and from the course of dealings in relation to prior fixtures and from market practice more generally, that Panamax Bulk (as the identified broker) would be entitled to its 1.25% from Norden. However, there is nothing in any of these exchanges to denote any objective agreement on behalf of Rusal to the payment of 2.5% commission to Natica, as its agent; nor is there anything in these exchanges to indicate to Panamax Bulk, on Norden's behalf, or a reasonable person in Panamax Bulk's position, that Rusal had objectively agreed to any such thing.

80. It is also unclear what part Natica actually played in the concluding of these COA's. From what Mr Osipov told Mr Riis, he attended meetings with, or spoke with the Board, but in the light of his repeated requests to be kept informed of developments, we have great reservations as to the extent to which he was really involved in the fixing of these two COA's. On 1 December, Mr Osipov emphasised that he had done *"a lot of work persuading BoD to accept"* the COA's. On 2 December, however, he complained to Mr Riis that he had been completely taken by surprise by the concluding of the Aughinish COA.

81. We recognise, of course, that it is an entirely different question as to what Mr Riis was reasonably entitled to believe and did believe as regards Mr Osipov's involvement in the concluding of the two COA's. Mr Riis may genuinely have felt that Natica had earned a share of commission on the two COA's, by dint of its stated efforts in persuading the Board to contract with Norden; and he may also have genuinely believed that without Natica's assistance, albeit behind the scenes, the fixtures with Norden would never have been concluded. In the light of his long-standing dealings with Mr Osipov, one can well understand why Mr Riis may have felt 'obliged' to protect Natica's expectation of earning commission in relation to the COA's. On the other hand, however, Mr Riis must have appreciated that Mr Osipov had in effect not just been sidelined but was being kept largely in the dark by Rusal as regards all relevant chartering negotiations and decisions concerning these two November 2007 COA's; and he must also have appreciated from his communications with Rusal that, whatever Natica may have been hoping for, Rusal was not seeking to obtain a commission for Natica in relation to the November 2007 COA's.

82. We cannot avoid the conclusion that there was in fact no agreement by Rusal in relation to Natica's entitlement to commission under

26

the two November 2007 COA's. Moreover, we have grave doubts as to whether Mr Riis believed that Rusal had actually agreed that Natica should receive commission under the two November 2007 COA's, a topic to which we return below.

83. On 1 December, and following on from further discussions between Mr Riis and Mr Osipov on 30 November, two commission agreements were apparently sent by Natica to Panamax Bulk. One apparently related to the 6 September 2007 COA but has not been produced. The other referred to a single COA of 30 November but has been assumed to apply to both COA's of that date. It provided as follows.

> *"1   The brokerage commission of 2.5% mentioned in Box 24 of the Charter Party to be collected by Panamax Bulk AS from the Owners monthly on the completed voyages after balances are settled between Owners and Charterers.*

> *2   The brokerage commission of 2.5% on freight, dead-freight, demurrage and detention to be paid by Panamax Bulk AS against respective invoices of Natica Shiping Ltd monthly".*

84. The parties to the Commission Agreement(s) of 30 November 2007 were Natica and Panamax Bulk. The Agreement produced to us was never signed. In providing for Panamax Bulk to collect the entire 3.75% and then to pay Natica's 2.5% share itself, Natica observed to Mr Riis on 1 December 2007 that ***"this should help us to avoid many questions from owners"*** (emphasis added). Later that day, Mr Osipov nominated a company called Maguire International Ltd (Maguire") to collect the 2.5% commission from Panamax Bulk through a Hong Kong Bank, Mr Riis being asked to *"kindly keep this matter strictly P+C."* Although Mr Osipov gave evidence that this arrangement reflected the fact that Natica owed Maguire money (in relation to real estate transactions in Russia), he was evasive on this topic and we entertain real doubts whether his account truly reflected the reality underlying Maguire's involvement in the commission chain.   We had no evidence at all as to who lay behind Maguire.

85. In an email from Mr Riis to Mr Osipov on 2 December 2007, Mr Riis complained that Rusal (apparently Mr Bolgarin) had told him that Mr Osipov had told Rusal that he (Mr Osipov) knew everything about the negotiations; and that he (Mr Osipov) could

get Rusal a better deal than that offered by Norden. Mr Riis complained to Mr Osipov that *"you should protect your source* [evidently Panamax Bulk] *better, since they are now putting up the question internal about whom is talking about everything to Natica."* Mr Riis also said that Rusal's direct intervention in the spot market was increasing; that it had been his understanding and it was his wish to work the spot market through Natica but that (as regards the spot market) *"now we are facing a similar situation as with the contracts* [ie the COA's]. *They are giving us the orders and are asking for offers."* This email from Mr Riis strongly suggests that he believed that Natica had already been cut out of the COA's by Rusal; that Natica had not, hitherto, been cut out of the spot fixtures; but that the spot fixtures were now going the same way.

86. Mr Osipov's response that same day was to talk about the *"internal fires"* and the *"strong internal tension"* within Rusal. He implied that it was now Mr Bolgarin who was 'on side,' and that *"now it's Pavel who forces Roman to fix voyages without Natica."*

87. The same day, Mr Osipov complained to Mr Riis that *"Geir [Ringdal – a director of Panamax Bulk] didn't tell me anything at all about fixing the Trombetas CoA with Roman."* As previously indicated, it rather looks as if the Trombetas COA had come as a complete surprise to Mr Osipov, as a result of Panamax Bulk having slipped up on its agreement that *"everything would be reported to us."*

88. We have already referred to the fact that recaps, both 'subject BoD approval' and in clean form had been prepared in different terms for Rusal and Norden, the former containing no reference to commission and the later containing reference to commission. It was Norden's evidence, which reflects our own experience, that it is well-nigh unprecedented to see a recap sent to shipowners (Norden) with a provision for 3.75% total commission for division; and a recap (or list of main terms for 'clean confirmation') sent to charterers (Rusal) with no reference to commission, and we are unable to accept Mr Riis' assertions to the contrary.

89. Even more extraordinary however is the fact that on 3 December 2007, Rusal asked Panamax Bulk to procure an *"official letter from Norden with confirmation of freight rates and other principal terms."* Norden duly provided such letters, signed by Mr

Christensen and Mr Fruergaard, for both COA's, unsurprisingly recording the fact of Norden's agreement to a provision – *"3,75 ttl com for division to be paid by owners."* Panamax Bulk then took it upon itself, without prior reference to Norden, to redact the provision *"3.75% ttl com for division to be paid by owners"* before sending the signed Norden documents on to Rusal, without any reference to commission at all. In the hands of Rusal, the documents purported to be signed official letters confirming the principal terms of the two November 2007 COA's; in fact, as Panamax Bulk knew, they were no such thing, untruthfully representing that there was no commission payable on 'Charterers' side.' There is no acceptable explanation for this conduct by Panamax Bulk. After the event, on 7 December, Panamax Bulk asked Norden for revised letters, without the reference to commission and Norden justifiably refused, seeking clarification of why this was now an issue. Panamax Bulk's response was that this would be discussed in Moscow but that *"that this is the way management wanted it."* According to Mr Riis' witness statement, the redaction was done *"at Rusal's request notified by Mr Osipov."* In our view, there was no justification in Mr Riis following Mr Osipov's instructions in this regard.

90. There were suggestions in Mr Riis' oral evidence that, even though there should be no reference to commission in the documents sent to Rusal, Mr Bolgarin and Mr Kudryavtsev (the chartering manager) had both, on separate occasions, told him that they agreed that Natica should be paid 2.5% commission, by Norden, under these two November 2007 COA's. Mr Riis' evidence on this was unclear, both as to the timing and the detailed content of any such statements, although he remembered one particular meeting over dinner in Moscow with Mr Kudryavtsev on Sunday 9 December. He also met with Mr Bolgarin, and Norden, in Moscow on 11 December.

91. There is no corroboration of this evidence at all and we cannot find that anything was said explicitly to Mr Riis to such effect by either Mr Bolgarin or Mr Kudryavtsev. The most that we can accept is that something may have been said to Mr Riis in Moscow, probably on 9 December 2007 by Mr Kudryavtsev, in the context of Natica's resumed involvement in ongoing Rusal fixtures (such as the Oldendorff fixture of 7 December 2007) to the effect that it was once again 'business as usual' with Natica, now that the Oldendorff matter had been resolved. This is a far cry from an

explicit endorsement by Rusal of the commission arrangements as regards the already concluded November COA's. Furthermore, we do not accept that there was any discussion with Mr Bolgarin concerning commission at the meeting, attended by Norden, on 11 December 2007.

92. Indeed, it seems to us that Mr Riis' conduct in excluding any reference to commission from any documents sent to either Mr Bolgarin or Mr Kudryavtsev, culminating in the redaction of the express provision to commission in the official letters signed by Norden which were sent to Mr Bolgarin on 4 December 2007, is entirely inconsistent with Mr Riis' evidence on this point.

93. There was an unsatisfactorily incomplete email of 6 December 2007 (disclosed in that form by Panamax Bulk but with no explanation for its apparent incompleteness) from Mr Bolgarin to Mr Riiis, relayed to and commented upon by Mr Osipov, in which Mr Bolgarin complained that he had had reports from owners that they had been receiving Panamax Bulk orders charged with 3.75% commission (compared to a more normal 1.25-2.5% commission) and that such high rates of commission were heavily influencing the freight rates being received from owners. Mr Osipov's reply to Mr Riis suggested that Mr Bolgarin was *"fully in the picture."* However, it also suggested that Mr Riis should reply to Mr Bolgarin by saying that *"3.75% commission is payable by shipowners according to their decision and that RUSAL got the lowest possible rates irrespective of the size of total commission. Please keep up to this story very firm when in Moscow."*

94. This email, and other communications referring to Mr Bolgarin at around this time, are capable of more than one interpretation. On its face, the email of 6 December 2007 does not suggest informed consent on the part of Mr Bolgarin to the payment of commission to Natica as regards the November 2007 COA's. It is theoretically possible, however, that Mr Bolgarin and/or Mr Kudryavtsev were aware of the true position but required fixture documentation which contained no reference to commission, for the purpose of buttressing their position (or even Natica's position) within Rusal in the context of the internal power struggle with others in Rusal who were unaware of the true arrangements and/or were opposed to Natica's continued involvement in Rusal's business. However, on the limited evidence available, we can not even come close to making any such finding.

95. What we can acknowledge, however, is that Mr Osipov certainly asserted or implied to Mr Riis that Mr Bolgarin (and perhaps others in Rusal) were aware of the true position.

96. We accept that Mr Riis was placed in a difficult position. Mr Riis had had a long-standing relationship with Mr Osipov (and Natica) as the exclusive representative of Rusal; the relationship was a close one, personal as well as professional. On one view, this entitled him to place considerable weight on Mr Osipov's continuing assurances that he continued to be, or was back in Rusal's 'good books;' on another view, he might have been expected to have known rather more about Mr Osipov's practices than another broker might have been able to discern. Moreover, it was also clear to Mr Riis that there was some sort of internal power struggle within Rusal, in which two of the main protagonists were clearly Mr Bolgarin on the one hand and Mr Ovchinnikov on the other hand, and that Mr Osipov was clearly caught between 'two chairs.' It was not unreasonable for Mr Riis to believe Mr Osipov when Mr Osipov told him that he continued to exercise at least some influence with at least some members of Rusal's senior management, including members of the Board.

97. Quite what Mr Riis believed the actual knowledge or state of mind of the various individuals controlling Rusal to be is unclear; and part of the problem is that he really had no idea, save from what he was told by Mr Osipov, as to who was controlling Rusal, and what particular line any relevant individual within Rusal was taking as regards Natica, particularly when Rusal was obviously plagued by an internal power struggle. Despite the rather damning passages in many of the communications quoted above, and despite the unacceptable redaction of the references to commission in the signed Norden letters, we accept, therefore, that the position is capable of being viewed as slightly less 'black and white' and slightly more nuanced than might at first sight appear to be the case.

98. Viewed in the most favourable light to Mr Riis, Mr Riis may have taken Mr Osipov at his word when Mr Osipov said or implied that some elements within Rusal, and specifically Mr Bolgarin, were 'on-side' with the commission arrangements. The requirement for secrecy, requested by Mr Osipov and complied with by Mr Riis, even as regards communications with those individuals, may

(extremely charitably) be explained as born out of a desire not to 'upset the apple-cart' as regards other, hostile elements within Rusal who might also have seen any such documents, particularly the official letters from Norden, and would have taken a dim view of Natica's purported entitlement to 2.5% commission under the November 2007 COA's.

99.  Quite where this (charitable) view of Mr Riis' conduct leads is analysed in the next section. However, even on that basis, two things are clear. First, even as regards those individuals who might have been thought (on the basis of what Mr Osipov had said) to be 'fully in the picture,' the policy would appear to one of not 'rocking the boat,' not drawing attention to the commission arrangements either in writing or orally, lest a hostile response be encountered even from those (supposedly favourable) elements within Rusal. Thus, even when Mr Riis met with Mr Bolgarin, in Moscow on 11 December 2007, the commission arrangements would have been a subject which Mr Riis would deliberately have steered clear of.

100. Secondly, Mr Pavel Ovchinnikov was, and was known by Mr Riis to be, Mr Bolgarin's boss. It was not seriously suggested by Mr Riis that Mr Ovchinnikov had ever confirmed to Mr Riis that he had agreed to the proposed commission arrangements, particularly as regards the November 2007 COA's. Moreover, on 4 December 2007, in anticipation of the series of meetings scheduled to take place in Moscow within the next week, Mr Osipov had emailed Mr Riis in the following terms:

*"Yesterday I had a very fruitful meeting with Roman [Bolgarin] to confirm, that everything is fine and we're working together. **Please be very careful meeting Pavel on Monday [10 December] and do your best to avoid discussing commission matter, even if he asks. Please also instruct Norden guys accordingly"(emphasis added).***

The email exchange of 6 December with Mr Bolgarin which referred to the possibility that *"Knut might dig further with Rolf and send similar messages to Pavel and one senior BoD member Kremer in Switzerland"* on the subject of the excessive 3.75% commission is in similar vein.

101. It was suggested by Mr Osipov that the 'Pavel' referred to by Mr Osipov in the email of 4 December was in fact to Mr Pavel

Kotelnikov, a much lower level chartering assistant, rather than to Mr Pavel Ovchinnikov. We reject this explanation. The references to 'Pavel' in the correspondence generally are to Mr Bolgarin's boss and it would make no sense if this email, uniquely, referred to someone else, and much less important at that. Moreover, Mr Riis' evidence both in cross-examination and at the end of his evidence, in answer to us was clear (despite a regrettable ambiguity in the transcript), namely that this was a reference to the fact that he was going to meet and did meet Mr Ovchinnikov on Monday 10 December 2007. Mr Osipov's exhortation to avoid discussing commission with the Director of the Alumina and Bauxite Division who was at that time charged with responsibility for, and known by Mr Riis to be responsible for major chartering decisions at Rusal (albeit under Board supervision), "*even if he asks*," is entirely inconsistent with any belief on Mr Riis' part that the most relevant individual at Rusal had consented to the relevant commission arrangements. We would also add that this message is entirely inconsistent with the suggestion previously made by Mr Osipov that Mr Ovchinnikov had agreed the 2.5% commission arrangement.

102. Accordingly, in our view, the evidence up to this point in the chronology demonstrates very clearly that Mr Riis was knowingly complicit in a stark lack of transparency towards Rusal as regards the proposed commission arrangements for the November COA's. It may be that such complicity (which was engineered by Mr Osipov) was directed towards some (rather than all) elements or individuals within Rusal, most notably Mr Ovchinnikov. However, there is no doubt that Mr Riis was by now involved in a scheme to avoid reducing to 'black and white' the fact of Natica's entitlement to commission (which Norden had agreed) so as to conceal that fact from any relevant persons at Rusal who might have cause to scrutinise the documents without any prior and informed knowledge of the subject transactions.

103. So far as Norden was concerned, as at the time of concluding the November 2007 COA's, it had, and had no reason to have any qualms about the revised commission arrangements and their proposed application to the two 30 November 2007 COA's. We accept that to Norden, believing that Natica was still involved as the 'chartering arm' of Rusal, the agreement to pay 3.75% total commission, for division, was no more than 'a minor point' which would not have detained it for very long.

104. There was a return meeting between Norden and Rusal at Rusal's office in Moscow on `11 December 2007. Mr Riis attended; Mr Fruergaard and Mr Hansen attended for Norden (Mr Christiansen being away); and Mr Bolgarin and Mr Kudryavtsev (possibly others) attended for Rusal. Natica was once again not present, something which surprised Norden in the light of Natica's perceived involvement in the COA's.

105. However, Mr Riis had by now sought Norden's agreement to the removal of the references to commission in the Norden official letters, a request which had been refused, but which had been left, cryptically hanging in the air, as something to be discussed in Moscow. We think it likely that, as Mr Hansen and Mr Freuergaard suggested, the topic of Natica would have been discussed privately with Mr Riis, when Mr Riis picked them up in a taxi en route to the meeting with Mr Bolgarin at Rusal's offices on 11 December 2007. According to Mr Freuergaard, Mr Riis told them that *"there was still some power struggle going on and thereby some tension within Rusal with regards to the relationship to Natica **so it was best if we did not mention anything about Natica in the meeting***" (emphasis added). In the light of this instruction, and Mr Osipov's previous injunctions, it seems inherently unlikely that the subject of commission or Natica's entitlement to commission would have been discussed openly and in plenary session in the presence of Rusal's representatives later that day.

106. On the other hand, it can legitimately be observed that Panamax Bulk must surely have planted some seeds of doubt in Norden's mind, as regards Natica, and Rusal's attitude towards Natica and its entitlement to the payment of commission, both in asking Norden to delete the reference to commission from the official letters and by Mr Riis making the statement en route to the meeting as set out above. Norden did not raise the issue itself and no doubt, for its part, also preferred to 'let sleeping dogs lie.' Any such seeds of doubt on its part do not appear to have stopped Norden making the subsequent payments of commission to Panamax Bulk in the amount of 3.75% for division.

107. In due course, the Porto Vesme and Trombetas COA's, as drawn up by (but containing no reference to) Natica were sent to Rusal. They contained no provision for commission (although the September 2007 COA had done so).

Subsequent events

108. On 29 December 2007, Mr Osipov advised Mr Riis that Mr Bolgarin had been dismissed. Mr Ovchinnikov was apparently seeking to put all the blame on Mr Bolgarin and Natica for past transactions; and was seeking to transfer all the existing COA's to Simpson Spence & Young ("SSY") and to pay commission only to SSY.

109. On 8 February 2008, there was a meeting in Copenhagen attended by Rusal (Mr Gordymov, the new Commercial Director, and an in-house lawyer), by Mr Christiansen and Mr Hansen and by SSY, who Mr Gordymov was seeking to introduce into the COA's, apparently in replacement of the existing brokers. Mr Gordymov had replaced Mr Bolgarin in January 2008 and Norden was informed that Mr Bolgarin had been dismissed for alleged fraud.

110. A Meeting Report was prepared by Mr Christiansen dated 19 August 2008, six months after the event, by which time all relations between Norden and Panamax Bulk had broken down; no contemporary notes of the meeting were produced.

111. The Report records lengthy negotiations between Rusal and Norden to reduce the number of shipments in 2008 and to reduce the freight rate, in respect of the Porto Vesme COA. Rusal said that the Porto Vesme plant was running at a loss, was threatened by possible closure and needed cost reductions with immediate effect. Agreement was therefore reached to spread the remaining shipments over two years (2008-9), rather than the balance of 2008, and for Norden to charge a lower freight rate for the 2008 shipments but not the 2009 shipments. On the face of it, and subject to the point raised in the next paragraph, there was absolutely no reason why the existing Porto Vesme COA could not have been maintained in force, but subject to an addendum providing for these varied terms. However, what was actually agreed was that the Porto Vesme COA would be terminated by agreement and replaced with two new COA's, one for 2008 and one for 2009, on materially identical terms to the existing Porto Vesme COA, save in the respects already identified.

112. Panamax Bulk submits that the driving force for the cancellation and replacement of the Porto Vesme COA, rather than its variation,

was the desire to change brokers and deprive Panamax Bulk (and Natica) of commission to which they were entitled under the existing arrangements. The presence of SSY at the meeting undoubtedly adds fuel to that particular fire. The Meeting Report drafted by Mr Christiansen states in terms that *"Rusal refused for all future business to have anything to do via old broker channel Panamax Bulk AS and Nautica (sic), and all future discussion would be via SSY."* Mr Christiansen's witness statement made it clear that the discussions concerned *"how the Weipa/Porto Vesme [COA] was to be reorganised in such a way as not to cancel it."* The Meeting Report makes it clear, however, that – once agreement had been reached on extending the period for shipments and revising the freight rate – *"Rusal no longer had any interest or any relation to Panamax Bulk AS and in order to summarize above [ie the revised arrangements] in a new agreement with SSY it was mutually agreed to cancel the present COA for 2008; and in return fix two new contracts for the remaining 23 cargoes in 2008 via SSY and likewise a new contract for the 16(15) cargoes in 2009."* The ousting of Panamax Bulk and its replacement with SSY could not have been more explicit. Notably, it was agreed that Norden would be held harmless against any commission claims which might be made by Panamax Bulk.

113. The Report records discussions about *"something definitely out of order"* as regards the commission payments. Rusal's principal complaint appears to be that it had received no address commission but since Mr Gordymov could not speak, with first-hand knowledge, as to whether or not Rusal had consented to the original arrangements whereby Natica took 2.5% commission, and since he clearly had an axe to grind against the previous management, this complaint was somewhat self-serving; so too was his subsequent evidence to the US Court. The Report also records Mr Gordymov as saying that *"Natica was no longer involved for this COA"* (ie the Porto Vesme COA), a statement which – if taken literally – might imply that it had originally been involved in that COA although we consider that this is reading too much into the sense of the discussions. The official confirmation of terms signed by Norden which had been sent (in redacted form) was then produced by Rusal, demonstrating (on its face) that Rusal had been informed that no commission had ever been agreed to be payable on Rusal's side, either to Rusal or Natica, something which was plainly not what Norden had agreed. Mr Christiansen's witness statement records that *"this alarmed us all at Norden,*

*Clearly, in the absence of a rational explanation, something extremely odd was going on. To put it shortly, we suspected fraud, particularly given what Mr Gordymov had said about Mr Bolgarin."*

114. However, no allegation of wrongdoing on the part of Panamax Bulk appears to have been made at that meeting. At the time, Norden's relationship with Panamax Bulk appeared to have survived. The Meeting Report suggests that Norden would stop paying the existing commission on the September 2007 and Trombetas COA's but to this extent, this may be an 'after-the-event' reference. On 4 March 2008, Mr Hansen informed Mr Riis merely that it had mutually been agreed at the meeting of 8 February 2008 that the total commission on the September 2007 and Trombetas COA's had been reduced to 1.25% payable to Panamax Bulk.

115. Whilst there may be a small element of reconstruction in the Meeting Report, and in Mr Christiansen's evidence, we see no reason to doubt its main thrust. Consistently with what had been discussed, on 23 February 2008, Mr Gordymov gave Panamax Bulk notice of termination of the Porto Vesme COA, the already scheduled lifting on the 'Apollo' to be the final lifting under the existing arrangements. Whether this termination gives rise to any claim on Panamax Bulk's part is addressed below. On 26 February 2008, SSY sent two recaps to Rusal and Norden, evidencing two replacement COA's for the Porto Vesme route, one for the 2008 and one for the 2009 year. The COA's provided for 1.25% commission (payable to SSY) and provided additionally that *"Norden to be held harmless should there be any commission claims from Panamax Bulk."*

116. It is noteworthy that, notwithstanding what had been said by Mr Gordymov at this meeting, and the alarm which this had caused Norden, payments of 3.75% commission were thereafter duly effected by Norden under both the Porto Vesme and Trombetas COA's. These payments, twelve in all, each in excess of $100,000, were all made by Norden between 18 March and 5 May 2008. We understand that, as regards the Porto Vesme COA, the payments all relate to shipments which had already been nominated before the date of termination; and it may be, we are not sure, that as regards the Trombetas payments, they too all related to prior nominations. Be that as it may, nothing said by Mr Gordymov on 8 February

2008 and not even the production of the redacted (and thus, untrue) signed Norden letter, led Norden to refuse to pay Panamax Bulk 3.75% commission for division on these 12 shipments; and this was so, even though Norden knew that that 2.5% of that commission would be forwarded to Natica and that Rusal was complaining that it was not receiving any part of this commission. For reasons which are not entirely clear, no invoices were ever presented and therefore no payments were ever made in respect of shipments under the September 2007 COA. As regards the payments which were made to Panamax Bulk under the November 2007 COA's, the 2.5% share was forwarded by it to Maguire in accordance with the "P+C" agreement between Mr Riis and Mr Osipov reached on 1 December 2007.

117. Had Panamax Bulk confined its claim to a 1.25% commission on the September 2007 and Trombetas COA's and had it 'gone quietly' on the termination of the Porto Vesme COA, all might have been well. However, Mr Riis pressed Norden to pay commission on the now terminated Porto Vesme COA and also pressed Norden to confirm that it would continue to pay 3.75% on all future shipments as well. Norden sought clarification of who the ultimate recipient of the 2.5% was. For his part, Mr Riis was caught 'between two chairs.' Mr Osipov was pressing him to recover the 2.5% commission for Natica and its 'principals' but consistently declined to allow those principals to be identified. Accordingly, Mr Riis had to 'stonewall' in the face of Norden's repeated requests for Panamax Bulk to identify on whose behalf the claim for 2.5% was being advanced. Conspicuously, however, Mr Riis did not answer Norden's questions by identifying Natica as its co-brokers and as the party entitled to 2.5% commission; this would have been the logical answer to give, had Mr Riis truly regarded Natica as the co-broker on the relevant fixtures. His explanation that Natica was not identified by him in this correspondence, because Norden already knew that Natica was involved, makes no sense. We conclude that what underlay this refusal on the part of Panamax Bulk to answer Norden's legitimate requests for the identification of the co-brokers was not only its appreciation that Mr Osipov wished to keep the identity of Maguire secret but its appreciation that Maguire was rather more than just the designated payee of commission which had been agreed to be due to Natica. In truth, this correspondence is corroborative of the fact that Mr Riis did not truly regard Natica as a co-broker entitled

to commission at all, at least as regards the November 2007 COA's.

118. On 30 June 2008, Mr Riis received notice from Natica that Rusal had terminated its exclusive brokerage agreement. Quite when Natica had first received that notice is unclear. Mr Osipov informed Mr Riis that he had received the notice on 4 March 2008, backdated to 23 January 2008. Somewhat earlier, an email of 30 November 2007 was apparently sent from Rusal to Mr Osipov in which Rusal sought to remove Mr Osipov's authority as regards the fixing and negotiating of freight contracts on Rusal's behalf unless specifically instructed in writing; Mr Osipov also challenged the authenticity of this email, although there is nothing questionable about it on its face. It can however be said, in Mr Osipov's favour, that the email of 30 November 2007 is not inconsistent with the existence of any authority which he may previously have had prior to that date. Panamax Bulk sought to rely on the fact that it did not have notice of the termination of the agreement until June 2008, and that the agreement was not in fact terminated until 2008, as justifying its case on the continuing authority and continuing perceived authority of Natica through November 2007 (when the November 2007 COA's were concluded). However, and irrespective of the contractual position between Rusal and Natica, there was nothing in the exclusive brokerage agreement which supports the argument that the two November 2007 COA's which were not in fact made by Natica on Rusal's behalf are somehow to be treated, fictionally, as if they had in fact been made by Natica on Rusal's behalf.

119. During the course of 2008, the lawyers had intervened. On 27 August 2008, Bentleys (on Norden's behalf) withdrew the offer to pay 1.25% commission to Panamax Bulk. On 5 September 2007, Bentleys (on Norden's behalf) treated Panamax Bulk as being in repudiatory breach of its obligations as Norden's brokers, which breach was accepted as bringing to an end any further obligations to pay commission and justifying (so it was said) the return of commissions previously paid. That communication was in turn treated by Waterson Hicks, then acting for Panamax Bulk, on 15 September 2008, as a renunciation of Norden's obligation to pay commission, which was accepted.

## THE ISSUES

### What contractual agreement was made for the payment of commission?

120. This question needs to be answered separately for the September COA on the one hand, and for the 30 November COA's and on the other hand. It also needs to be answered in two separate respects, firstly as regards what agreement(s) were concluded between <u>Rusal</u> and Norden for the benefit of the brokers (and for the purposes of Panamax Bulk's claim under the 1999 Act); and secondly, as regards what collateral agreement(s) (if any) were concluded between Panamax Bulk and Norden for the purposes of any independent claim by Panamax Bulk against Norden.

### Rusal-Norden Agreement.

### (i) September 2007 COA

121. As regards the September 2007 COA, the original Rusal – Norden agreement, as evidenced by the recap of 6 September 2007, is clear: there was a contractual agreement whereby Norden would pay Panamax Bulk 1.25%.

122. As to whether the September 2007 COA was varied by later agreement, we have already concluded that Norden's case on want of authority on the part of Panamax Bulk should be rejected; and that we are proceeding on the basis that the variation was binding on Norden (see paragraphs 58-60 above).

123. In our view, therefore, it follows that Norden agreed to pay *"3.75% total commission for division"* in accordance with the terms of the executed charterparty.

124. The point is made by Norden that this agreement does not provide for the 3.75% to be paid to Panamax Bulk and that it would have been open to Norden to pay 1.25% to Panamax Bulk, and 2.5% to Natica. Certainly, this construction of the agreement is open to Norden on the wording of the clause; and the wording of the second paragraph of the email of 9 November 2007 which formed the background to the agreed variation would also support that view. It is fair to say that Norden's evidence is that it understood

40

that it would be paying the full 3.75% to Panamax Bulk for onwards distribution; and this is what it did, as regards payment of commission under the November 2007 COA's, but there is nothing in the contract which required that that payment mechanism should be followed. This is an issue which will recur when we consider the application of the 1999 Act.

(ii) November 2007 COA's

125. Panamax Bulk submitted that it was enough that Norden agreed with Panamax Bulk to pay 3.75% and that Rusal agreed with Natica that Natica could earn 2.5% commission in respect of the November 2007 COA's. We disagree. The issue at this stage of the analysis is what Rusal agreed with Norden should be payable by way of commission. In the first instance, this is a fairly basic matter of offer and acceptance.

126. As we have already found (see paragraph 78), objectively construed, the November 2007 COA's were concluded in negotiations between Rusal and Panamax Bulk, on Norden's behalf. There was no reference to commission in any of those exchanges.

127. This led Norden to argue for the extreme position, albeit faintly, that there was not even any entitlement to 1.25% commission on the part of Panamax Bulk under the November 2007 COA's. We reject that submission. On the true construction of the two contracts being concluded with Rusal, or necessarily implicit therein, against the backdrop of previous dealings and market practice, Rusal agreed that Panamax Bulk should be paid the customary 1.25% brokerage. To the extent that the recap sent to Norden or the official letter signed by Norden included an allowance for 1.25% commission payable to Norden, it correctly reflected the true bargain which was made with Rusal.

128. However, we are unable to accept that the same holds true for the additional 2.5% payable to Natica. Unlike in previous fixtures, where the relevant contract was concluded in communications between Natica (for Rusal) and Panamax Bulk (for Norden) and where each communication to Natica (as Rusal's agent) included reference to the 2.5% commission, there is simply nothing (as regards the November 2007 COA's) that 'crosses the line' and which might be said to amount to an offer to Rusal that 2.5%

commission should be paid 'on Charterers' side' or to an acceptance of an offer that 2.5% commission should be paid 'on Charterers' side.'

129. Panamax Bulk was driven to make two submissions, neither of which (to our mind) came close to succeeding. The first was that the November 2007 COA's were made partly in the exchanges between Rusal and Panamax Bulk, and between Panamax Bulk and Norden, and partly in the private exchanges between Mr Osipov and Mr Riis. We regard that interpretation of the 'P&C' communications between Mr Osipov and Mr Riis, which were intended to be kept secret from Rusal, as hopeless. The second was that it was implicit in the exchanges between Rusal and Panamax Bulk that a 2.5% commission on Charterers' side was being sought, offered and accepted. That too is hopeless. In truth, the deletion of the commission clause, not just in all communications with Rusal, but also in Norden's official letters when sent on to Rusal, purportedly confirming the main terms of the November 2007 COA's, demonstrates just why the exchanges between Rusal and Panamax Bulk were necessarily incompatible with any (implied) provision for commission on 'Charterers' side.'

130. We conclude that the relevant contracts concluded between Rusal and Norden provided, as regards the payment of commission under the November 2007 COA's, that Panamax Bulk would be paid 1.25%

An independent contract or contracts between Owners and Norden?

131. It is fair to say that this aspect of the case received greater attention as the hearing progressed, in the light of questions from us. However, the point may be academic, in the light of other conclusions. Nonetheless, we now deal with Panamax Bulk's alternative case that – as regards the claim for 1.25% - it has an independent contractual claim to recovery of that commission in the light of a free-standing agreement or agreements between Norden and Panamax Bulk that it should be remunerated for its services. The claim under this head is specifically confined to the 1.25%.

132. The background to this argument is as follows. Panamax Bulk has been treated throughout as 'Owners' broker' and it is common ground that, as between Rusal and Norden, it is Norden's

obligation to pay Panamax Bulk. Moreover, in each reference, Norden has actually alleged a contractual retainer of Panamax Bulk for the purpose of establishing duties owed to it by Panamax Bulk, which duties were (it is alleged) breached and which gives rise to some very significant issues raised by way of defence, set-off and counterclaim. On top of that, we wondered (out loud) whether the same difficulties of enforcing, at common law, a claim for commission made by a charterer's broker or intermediate broker (treating the charterer as trustee of a promise made to the charterer by the shipowner) apply to a shipowner's broker; and whether a charterer needs to agree the commission payable by a shipowner to a shipowner's broker at all, in order for the shipowner's broker to have an enforceable claim for commission.

133. There is no express contract between Panamax Bulk and Norden. It seems to us that there is no analytical problem in implying such a contract (or more accurately perhaps, three such contracts, in respect of each COA) along the following lines: in consideration of Panamax Bulk introducing to Norden a particular piece of business and concluding a binding fixture on its behalf (and providing any ancillary post-contractual services in respect thereof), Norden agrees to pay Panamax Bulk a 1.25% (ie usual) commission for such services. That such a contract can exist is specifically recognised in this particular context in <u>Shipbrokers and the Law</u> (1997) page 93. Although a contract will not be implied unless it is necessary, we are attracted by the proposition that it will often be necessary to imply into the relationship between shipowner and shipowner's broker the existence of a contract, with concomitant obligations and a right to remuneration on the part of the broker; this seems more attractive than leaving the shipowner's broker to the vagaries of enforcing a contract between charterer and shipowner which may make no provision for its remuneration (because the charterer is only interested in contracting for the commission payable on its side).

134. Be that as it may, we are not convinced that it need pursue this matter. We have found that there was a 1.25% entitlement to commission on the part of Panamax Bulk under both the September and November 2007 COA's. If we had felt that there was some lacuna in the contract between Rusal and Norden, as regards that 1.25%, or some difficulty in enforcing Panamax Bulk's entitlement to that 1.25%, we would have been prepared to make the relevant findings in relation to the September 2007 COA

and the November 2007 COA's but it seems to us that such findings are unnecessary.

## Claim under the 1999 Act

135. Panamax Bulk claims both for its 1.25% share and for Natica's (or other interested party's) 2.5% share under the 1999 Act.

136. In our view, for the reasons explained below, there is no impediment to Panamax Bulk's entitlement to claim its 1.25% commission under the Act, under the September and November 2007 COA's.

137. As regards the 2.5% claim, we have already held that there was no agreement between Rusal and Norden for the payment of the 2.5% commission as regards the November 2007 COA's and thus there is no relevant 'third party' right capable of enforcement under the Act at all. As regards the September 2007 COA, however, we are proceeding on the basis that, by binding variation, there was such a right as regards the 2.5%. For the reasons explained below, we conclude that Panamax Bulk has no entitlement under the Act to claim 2.5% commission on behalf of Natica (or its principals), either under the September 2007 COA (where we are proceeding on the basis that it had been agreed that 2.5% would be payable to Natica as a term of the contract between Rusal and Norden) or (if we are wrong on our factual conclusion as regards what had been agreed under the November 2007 COA's) under the November 2007 COA's as well.

138. Section 1 of the Act provides, in so far as relevant, as follows.

*"(1) Subject to the provisions of this Act, a person who is not a party to a contract (a "third party") may in his own right enforce a term of a contact if –*
*(a)    the contract expressly provides that he may, or*
*(b)    subject to subsection (2) the term purports to confer a benefit on him.*
*(2)    Subsection (1)(b) does not apply if on a proper construction of the contract it appears that the parties did not intend the term to be enforceable by the third party.*

44

*(3) The third party must be expressly identified in the contract by name, as a member of a class or as answering a particular description...*

*(4) This section does not confer a right on a third party to enforce a term of a contract otherwise than subject to and in accordance with any other relevant term of the contract."*

139. It is common ground that section 1(1)(a) is inapplicable on the facts.

140. So far as concerns the claim for Panamax Bulk's 1.25% commission, it is common ground, and in any event indisputable, that the term in both the September and November 2007 COA's providing for the payment of 1.25% commission purports to confer a benefit on Panamax Bulk (see section 1(1)(b)). Moreover, there is nothing to suggest that the parties to the relevant COA did not intend the term to be enforceable by Panamax Bulk (see section 1(2)). For the purposes of subsections 1(1) and 1(2), questions concerning the existence of the term, whether it 'purports' to confer a benefit on the third party and whether the parties intended that it should confer a benefit on the third party, all raise issues of construction of the contract as a whole, in its 'factual matrix.' The familiar ICS v West Bromwich and Chartbrook principles apply. There are no difficulties at this stage of the analysis as regards the claim for 1.25%.

141. As regards any claim for 2.5% however, there are real difficulties.

142. It is common ground, and as a matter of common sense it must follow, that although this additional requirement is not recorded expressly in section 1, a third party can only recover under the Act "if and to the extent that a term purports to confer a benefit on him." The idea that any term which conferred a small benefit on a third party could be enforced by him to any greater extent would seem absurd. Insofar as necessary, the implication is supported by the decision in Nisshin Shipping v Cleaves [2004] 1 LLR 38.

143. This analysis leads on inexorably to the question of whether the term providing for 3.75% commission 'for division' conferred a benefit on Panamax Bulk, as regards Natica's 2.5% share. It can plausibly be said that, to this extent, the term purports to confer a benefit on Natica, not Panamax Bulk. On the other hand, however, it can be said that a head broker 'benefits' from the entirety of a

provision that the owner should pay it the full amount of commission, part of which is for onwards transmission to a broker further down the chain, because the head broker is thereby enabled to fulfil its commitments to such sub-brokers or intermediate brokers in the chain. We see force in Panamax Bulk's rhetorical question as to why, if a term provides for payment of a sum of money to a third party, the payer should be able to question what the payee intends to do with the money for the purpose of raising a dispute that the whole clause is not intended for the payee's benefit.

144. Panamax Bulk originally submitted that Natica would have been able to enforce its right to the 2.5% commission as against Norden by a direct claim under the Act; and Norden adopted that submission. If that submission were correct, it casts doubt on the extended meaning of 'benefit' canvassed above since we regard it as inherently unlikely that both brokers would have been provided with a right of action for the same commission.

145. However, in dealing with this question, we must also confront the application of section 1(2). Did the parties, ie Rusal and Norden, intend the term as to 2.5% commission (assuming it to have been agreed) to be enforceable by Panamax Bulk, by Natica or by both parties? The latter solution, involving potential double jeopardy for Norden, is unrealistic; and the former solution (consistent with the submission of both parties that Natica did have a right of suit) would preclude Panamax Bulk's claim for the 2.5% under section 1(2).

146. In our view, the starting point is the proper construction of the contract. If, on its true construction, Natica had a right to sue Norden for its 2.5% share, then to that extent, the term as to commission did not purport to confer a benefit on Panamax Bulk and the parties did not intend the term to be enforceable by Panamax Bulk. No right of recovery, to that extent, would lie in Panamax Bulk's name. If, 'per contra', the contract provided that Panamax Bulk alone could sue for the 3.5%, then we would conclude that this provision purported to confer a benefit on Panamax Bulk for the entire commission, whatever obligations down the broking chain Panamax Bulk intended to satisfy out of the moneys so received, and the term was (by definition) intended to be enforceable as a whole by Panamax Bulk.

147. The relevant clause, included in the September 2007 COA, as drawn up, and included in the recap and official letters sent to and signed by Norden provided for *"3,75 ttl com for division to be paid by owners."* We are satisfied that Norden intended and is to be taken as having agreed and (on the assumption that Rusal authorised the relevant arrangements) Rusal intended and is to be taken as having agreed that of this commission, 1.25% was earmarked for Panamax Bulk and 2.5% was earmarked for Natica. Whilst the parties may have agreed that the mechanism for paying Natica was to remit the entire proceeds to Panamax Bulk first, for onwards transmission, this was really no more than an agreement as to the means by which Norden's obligation to Natica, or to Rusal as regards the remuneration of Natica on its behalf, was to be discharged. The analogy with the decision in Dolphin Maritime & Aviation Services Ltd v Sveridges Angfartygs Assurans Forening [2009] 2 LLR 123, albeit on quite different facts, seems apt. Properly construed, Norden's agreement with Rusal to pay 2.5% commission to Natica, via Panamax Bulk, under the September 2007 COA was not an agreement to pay Panamax Bulk the 2.5% qua principal but rather an agreement to pay Panamax Bulk the 2.5% qua agent or trustee for Natica and/or Rusal. This is to be distinguished from Norden's obligation to pay Panamax Bulk the 1.25% qua principal. Following the approach taken in Dolphin, such an agreement is insufficient to confer a benefit on Panamax Bulk as regards the 2.5% for the purposes of the Act.

148. This approach renders the interpretation of the commission clause providing for the payment by Norden of 3.75% total commission 'for division' on exactly all fours with that applied in Nishin. We recognise that in this case, unlike in Nishin, there was an indication as to which broker should be paid first. However, as indicated above, this was for ministerial purposes. In substance, and on the true construction of the agreements in this case, the provision 'for division' implies a legal obligation on the part of Norden to pay both brokers, enforceable as to their respective proportions but not otherwise by each.

149. Since Natica is not a party to this arbitration, any claim for the 2.5% (were it otherwise sound) can not be advanced. This is not a bare 'title to sue' point and we do not reach this conclusion with any regret. As already observed, no discovery has been provided by Natica; Mr Osipov's evidence was, at times, evasive; and we have no idea who the real principals interested in the 2.5% really

are. In all the circumstances, the argument that any term as to the payment of the 2.5% commission purports to confer, and was intended to confer a benefit on Panamax Bulk strikes us as somewhat hollow.

150. For completeness, we add that the same reasoning would have applied to the November 2007 COA's, had we accepted Panamax Bulk's case that there had been an agreement to pay Natica 2.5% commission thereunder. The same wording 'for division' is to be found in the recaps or official signed letters sent to or prepared by Norden as regards the November 2007 COA's and which Panamax Bulk has also (unsuccessfully) sought to enforce.

151. Turning back to the claim for 1.25%, there was one further threshold to cross, one which would also have applied to the claim for the 2.5% if it could otherwise have been advanced. This is the test of 'express identification' of the third party in the contract under section 1(3) of the Act. As was held in Avraamides v Colwill [2006] EWCA Civ, the word 'express' does not allow for a process of implication (which we fully accept) or for a process of 'construction.' That latter restriction is more puzzling but we interpret it as precluding any recourse to the jungle of 'factual matrix' material which would be available to assist in the construction of a contract on ICS principles. The dictates of certainty which underlie this part of the Act require a more explicit form of identification.

152. It is common ground that the September and November COA's were each 'otherwise' on the pro-forma terms of the standard Gencon charterparty, with logical amendments, which had formed the basis of the 31/10/06 fixture. The September 2007 drawn up charterparty expressly provided for 3.75% total commission for division under the express heading in box 24: *"Brokerage commission and to whom payable."* Standard clause 15 was itself entitled *"Brokerage."* Even without a formally drawn up charterparty, which was the case for the November 2007 COA's, reading the recaps and the pro-forma charterparty terms together (which one must, because the recaps expressly incorporated the pro-forma terms), it was obvious and explicit, and not merely implicit, that the agreed provisions as to commission in the recaps were to be treated as written into standard Box 24 and standard clause 15. As we have already said, to the extent that the Norden recaps for the November 2007 included an allowance for the 1.25%

commission payable to Panamax Bulk, they properly reflected the consensus which had been made between Rusal and Norden.

153. In these circumstances, we have no difficulty whatsoever with the proposition that Panamax Bulk is expressly identified in the contracts as 'a member of a class' ('brokers') or as 'answering a particular description' ('brokers'). It is accepted, and is obviously correct, that Panamax Bulk did not need to be identified by name. Norden's only point under this head was that the contracts did not say that the commission was payable to the brokers, only that it was payable, but this argument (which sought to invoke the very different facts in Avraamides where the argument was that a clause dealing generically with persons to whom 'liabilities' were owed could be treated as expressly identifying 'customers') seems wholly unrealistic. This is one of those cases ('estate agent's commission' might be another one) where the description of the type of payment ('brokerage' or 'brokerage commission') expressly identifies the class or description of the agreed payee (brokers). The idea that Panamax Bulk's claim under the Act was fatally flawed because the contracts did not provide – "brokerage commission of 3.75% for division to be paid by owners to the brokers" seems unreal. This conclusion is entirely consistent with paragraph 24.4 of Voyage Charters (2007).

154. For these reasons, we conclude that Panamax Bulk has an entitlement to claim for its 1.25% share under the Act, but not for Natica's 2.5 % share. If it had been necessary, we repeat that we would also have found that Panamax Bulk had an independent claim in contract against Norden, outside the Act, for its 1.25%.

Panamax Bulk's claim for 1.25% commission

155. Subject to the further issues dealt with below, we conclude that Panamax Bulk has an entitlement to 1.25% commission on any freight, dead-freight and demurrage earned under (i) the September 2007 COA and (ii) the remaining voyages performed under the Trombetas COA, beyond those (five) voyages for which it has already been remunerated. It has already been paid commission for all voyages under the pre-termination Porto Vesme COA.

156. On the basis of a 1.25% entitlement to commission, the quantum of this claim has been agreed as follows: (i) US$291,384.76 (as regards the September 2007 COA), the whole of which remains

unpaid; and (ii) US$777,743.73 (as regards the Trombetas COA), part of which has already been paid. Panamax Bulk did not suggest that any additional sums by way of dead-freight had been earned under either COA. It did suggest, however, that there were some (unexplained) short shipments which justified a further claim for commission, or at least justified a declaration upholding its right to further commission in the (conjectural) event that Norden might succeed in a claim over against Rusal in due course. We reject any such additional claims which are not supported on the facts (as evidenced to us) or on the proper construction of the relevant brokerage clause.

## Set-off or counterclaim for mistaken overpayment?

157. It follows from the above analysis that, as regards the payments of commission which have already been made in relation to the Trombetas and Porto Vesme COA's, Norden have paid Panamax Bulk 3.75% commission for distribution when, on our analysis, it was under no obligation to do so (the only concluded agreement under the November 2007 COA's having been for 1.25% commission). Norden has pleaded a case of equitable set-off in relation to the consequences of its case on deliberate breach of duty, which we deal with below. However, in his closing submissions, Mr Croall Q.C. for Norden alluded to an additional defence of set-off and/or counterclaim which Norden wished to pursue, hitherto unpleaded, to the effect that (irrespective of the serious allegations of breach of duty and dishonesty on the part of Panamax Bulk and Mr Riis which we address below), Norden had over-paid commission in respect of the Trombetas and Porto Vesme COA's (pursuant to the 12 invoices tendered and paid at 3.75%) and that Norden should be permitted to set-off against any further claims for 1.25% commission the overpayments made (as regards the additional 2.5%) on the previously settled invoices, and, if necessary, counterclaim for any balance. A formal application for permission to amend was made after the hearing.

158. We allow the application for permission to amend, albeit made belatedly, since it arises out of the arguments made at the hearing and causes no prejudice to Panamax Bulk. However, we reject the argument on the facts.

159. As regards the September 2007 COA, no payments and therefore no over-payments have been made and Norden accepted that any

50

claim for overpayment in relation to the Trombetas and Porto Vesme COA's, could not, on this ground, give rise to a defence of set-off in relation to claims for outstanding 1.25% commission otherwise due under a separate COA. We emphasise the words 'on this ground' because the equitable set-off defence is not so constrained. The claim for US$291,384.76 under the September 2007 COA stands.

160. As regards the claim for outstanding 1.25% commission due under the Trombetas COA, the mere fact that Norden has previously paid 3.75% commission to Panamax Bulk in respect of previous shipments does not, of itself, justify either a claim for repayment, or a defence to the 1.25% claim on further shipments, simply because (so we have held) there was no entitlement to 3.75% commission under this COA. It would be necessary for Norden to establish that the original payments had been made by mistake. No evidence was specifically called to support this case (no doubt, because it was only advanced in closings) but the allegation that *"such payments were made in the mistaken belief that the November CoAs contained a provision requiring Norden to pay commission at the rate of 3.75%, such belief being based upon the recaps of the fixtures as provided to Norden,"* does not stand up to scrutiny. Each of the relevant payments were made after the meeting with Mr Gordymov, at which (so Norden's evidence has demonstrated) the discrepancy between the two sets of recaps and thus the potential 'offer and acceptance' argument was revealed. It is no answer for Norden to say that the payments related to prior nominations since, even as regards the prior nominations, on the basis of the Rusal versions of the recap and signed Norden letter, there had been no concluded agreement to pay 3.75% commission. Accordingly, we reject this additional defence, both as regards the Trombetas COA and, insofar as relevant in the light of the next topic on our 'examination paper,' as regards any further sums due (whether by way of debt or damages) in respect of the Porto Vesme COA. Norden's entitlement to recover commission already paid depends upon it making good its case on serious breach of duty which is analysed below.

The claim for damages: the termination of the Porto Vesme COA

161. The relevant claim is brought under section 2 of the Act and at common law, for breach of an implied term. We refer back to

51

paragraphs 109-115 above where the circumstances surrounding this termination have already been partly addressed.

162. Section 2 of the Act provides as follows:

*"(1) Subject to the provisions of this section, where a third party has a right under section 1 to enforce a term of the contract, the parties to the contract may not, by agreement, rescind the contract or vary it in such a way as to extinguish or alter his entitlement under that right if –*

*(a) the third party has communicated his assent to the term to the promisor,*

*(b) the promisor is aware that the third party has relied on the term, or*

*(c) the promisor can reasonably be expected to have foreseen that the third party would rely on the term and the third party has in fact relied on it."*

163. There is no real issue that the proviso to section 2(1) has been satisfied. Panamax Bulk (by words and conduct) communicated its assent to the term to Norden; and Norden was either aware that Panamax Bulk had relied on the term or (at the very least) could reasonably have been expected to have foreseen that Panamax Bulk would rely on the term and Panamax Bulk had relied on the term.

164. Section 2 does not prevent the consensual rescission or variation of bilateral contracts, save to the extent that such conduct would extinguish or alter the third party's right to enforce the relevant term for his own benefit. In the present context, the relevant term entitled Panamax Bulk to a 1.25% commission on freight, dead-freight and demurrage *"earned"* under the charterparty. This wording led Norden to submit that, as regards freight which had not yet been earned under the Porto Vesme COA, there was no present right under section 1 to enforce any right to commission and thus no 'entitlement under that right' which had the protection afforded by section 2. The submission boiled down to this: section 2 prevented any agreement between Norden and Rusal which extinguished or altered Panamax Bulk's accrued right to commission in relation to freight which had already been earned; but nothing further.

165. We confess that we are not attracted by this argument. A third party does not really need the protection of Section 2 if it already

52

has an accrued right to sue the promisor since the enforceability of that right would presumably be unaffected by the subsequent agreement of the contracting parties in any event. Moreover, the Act was intended to protect the legitimate expectations of third parties as regards the enforceability of promises made for their benefit, and Section 2 was clearly intended to protect the third party against the risk that its expectations might be thwarted by subsequent dealings between promisor and promisee. Norden's construction of Section 2 would denude it of any effect, whenever the third party had a future or contingent right to the benefit of a contract. If two contracting parties agree that a benefit will be conferred on a third party, but only upon a future date or upon the happening of a future contingency, and the requirements of Section 1 and of the proviso to Section 2(1) are otherwise satisfied, it is difficult to see why the two contracting parties should subsequently be able to denude the third party's future or contingent right of effect. The context might involve the payment of money, in the future; but it could equally involve an agreement to hold sub-contractors exempted from liability in respect of future services; and in both cases, the third party might have relied on the promise that, in the future, it would have the benefit of the clause.

166. In the immediate context, we agree that Panamax Bulk did not, as at the moment of termination of the Porto Vesme COA, have a then enforceable right to commission on future shipments, in respect of which freight had yet to be earned. What it did have, however, was the right to receive 1.25% commission on such freight as was earned in the future on shipments made under the long-term COA, which long-term COA had been procured by Panamax Bulk's efforts and which guaranteed Norden a profitable long-term revenue stream with a counterparty (Rusal) with whom it would not otherwise have done business. Panamax Bulk was entitled to expect 1.25% commission on all future shipments made under that COA. On Norden's view of Section 2, Norden and Rusal could have combined to agree that the provision as to commission would be deleted but that the provisions of the Porto Vesme COA would otherwise have been left in full force and effect, thereby leaving Panamax Bulk unprotected by the statute. This is wholly unpalatable.

167. However, and like most of the points in this case, there is another side to the argument. It might legitimately be said that Section 2 could not have been intended to prevent Rusal and Norden from

53

reaching a commercial agreement to amend the terms of the long-term COA, for example based upon changes in the shipping market, changes in the market for bauxite or operating conditions at the Porto Vesme plant, which might lead to alterations to the freight rates on future shipments or the timetable for future shipments, or both. This is, in part, what transpired in February 2008, when Mr Gordymov requested and obtained an amendment to the existing terms. On a literal view of the Act, such amendments in themselves would 'alter' Panamax Bulk's entitlement to commission in that any commission on future shipments would be reduced, by reason of any reduction in the freight agreed to be earned thereunder. Is that sort of commercial arrangement proscribed by Section 2?

168. Our initial temptation is to say: 'no.' The editors of Time Charters share that view (see paragraph 36.7). However, the distinction there drawn between *"a variation of the charter designed to prevent the broker from earning commission on an ongoing charter"* (which the editors consider is prohibited by Section 2) and *"an early termination for other reasons ... [which] merely has the practical effect that no further hire is in fact earned or paid and hence no right to commission arises"* is a very difficult one. Section 2 focuses on the effect of the purported rescission or variation on the third party's entitlement ("in such a way") and not the motive behind it ("for the purpose of").

169. This point undoubtedly requires judicial consideration in an appropriate case. On balance, we have come to the view that what really matters in this case is the nature of the entitlement being conferred on Panamax Bulk; it is not a right to earn 1.25% commission on an immutable number of shipments made within an immutable period at an immutable freight rate; it is a right to 1.25% commission on such freight as is earned, the value of which (third party) right is susceptible to change in the light of legitimate future commercial dealings between the parties. Accordingly, and given that for valid commercial reasons, Rusal and Norden did agree to alter the freight rates on future shipments (in 2008) and the timetable for future shipments (extended into 2009), Panamax Bulk would only be entitled to 1.25% commission on freight earned pursuant to those revised arrangements, and thus at the revised freight rate.

170. However, this still leaves the fact that Norden and Rusal agreed to terminate the Porto Vesme COA, and replace it with two substitute COA's (one for 2008 and one for 2009), rather than issue an addendum to the original COA with extended dates and revised rates. There was no valid commercial reason for this course of action. SSY had by now been brought onto the scene and it is very clear to us that the predominant reason, indeed the sole reason, for terminating the existing COA and replacing it with two COAS's, rather than issuing an addendum to the original COA, was to exclude the existing brokers from the ongoing relationship and to remove (or try to remove) the existing brokers' ongoing entitlement to commission. This is a strong finding to make but we feel amply justified in making it, by reference to the evidence in paragraphs 112-115 above. The indemnity provided by Rusal to Norden in respect of any future claims by Panamax Bulk only serves to reinforce that conclusion.

171. We do not consider that it matters that it was Rusal, and not Norden, who provided the impetus for the termination and replacement of the Porto Vesme COA. Norden agreed to it. In our view, it would be no answer to say that Norden felt compelled to agree to Rusal's demand, for the commercial reason that it thought that it might have lost the business altogether, had it not agreed to the demand. In any event, we do not accept that that argument is made out on the facts. It is clear that Rusal wanted to continue with Norden and there is no reason for thinking that Norden felt that it might lose the business. It agreed to accommodate a variation to the timetable and the freight rates for future shipments. However, it also went along with the proposed termination and replacement of the COA, the only purpose of which was, and was evidently to cut Panamax Bulk out of the loop and replace it with SSY.

172. This leaves the legal consequences of this finding of fact. First, we conclude that the agreement to rescind the Porto Vesme COA and replace it with two new COA's, one for 2008 and one for 2009, for the same total number of remaining voyages, being made for the sole purpose of cutting Panamax Bulk out of the broking chain, was an agreement which was made 'in such a way' as to extinguish Panamax Bulk's entitlement under the right (conferred by Section 1) to enforce the term of the COA that it should be paid 1.25% commission on all freight, dead-freight and demurrage under the Porto Vesme COA. We conclude that the termination agreement

55

(but not the commercial variation to the period of shipments or the freight rates) falls foul of Section 2.

173. Secondly, and somewhat symmetrically, we are satisfied that Norden breached an implied term in the COA (and, if necessary, in an independent contact between Norden and Panamax Bulk) as regards its obligations concerning the payment of commission.

174. As authorities such as French v Leeston Shipping [1922] 1 AC 452 and The "Manifest Lipkowy" [1989] 2 LLR 138 make very clear, the law will not imply into an agency contract between A (the agent) and P (the principal), or into a contact between TP (the third party) and P which is made by A on P's behalf, and which provides for the periodic payment of commission to A, *"that P will not, in a manner involving no breach of contract, make a further contract with TP which will prevent the first contract from running its full course and so deprive A of the commission he would otherwise have received."*

175. However, it was common ground before us, and is in any event supported by 'dicta' of high authority in White v Turnbull Martin (1889) 3 Com. Cas 183 and French v Leeston @ 455 per Lord Dunedin that the law will imply a term to the effect that a shipowner will not enter into an arrangement with a charterer, the sole purpose of which was to deprive a broker of its commission. This falls within the 'wilful default' proviso discussed in some of the authorities. On the facts, not only do we accept that such an implied term existed but, as regards the termination and replacement of the COA, we find that it was breached by Norden. So far as the termination and replacement element of the February 208 arrangements were concerned, we find that this was *"simply and solely to avoid payment of the commission."*

176. Accordingly, we hold that Panamax Bulk would be entitled to relief under Section 2, either for sums due by way of commission on the basis that (as between Panamax Bulk and Norden) the original COA, amended by the revised commercial terms as to date of shipment and freight, is to be treated as continuing and/or for damages; alternatively it would be entitled to damages for breach of the implied obligation identified above. The quantum of this claim (which is limited to the 1.25% share) has been agreed as US$901,401.50. We reject any suggestion that this claim should be increased by reference to any (unexplained) short

shipments. However, we would stress that the allowance of the Porto Vesme claim is subject to the issue of breach and/or dishonesty to which we now turn.

## Breach and Dishonesty on the part of Panamax Bulk and Mr Riis

177. Norden's case is that (i) Panamax Bulk owed various duties as agent towards Norden; (ii) Panamax Bulk was in 'serious' or 'repudiatory' breach of those duties; (iii) Mr Riis also acted dishonestly in assisting Natica and Mr Osipov to breach its duties towards Rusal and/or knowingly received monies held on trust for Rusal and is liable as an accessory or constructive trustee; and by reason of such matters (iv) has no entitlement to any remuneration in respect of any of the COA's in issue and (v) is liable to return all commission already paid. This is obviously a very grave set of allegations and one with profound implications for these arbitrations.

## Panamax Bulk's duties towards Norden

178. We accept the submission that as Norden's agent, Panamax Bulk owed duties to use reasonable skill and care in the performance of its undertakings (Bowstead & Reynolds (18th ed) Article 40) and duties of good faith, honesty and fair dealing (Bowstead & Reynolds Article 43). These duties are reflected by the provisions of the Baltic Code and were accepted by Mr Riis in his evidence.

179. The precise content of these duties obviously depends on the particular relationship in question and the particular undertakings assumed by the agent. Panamax Bulk was not an exclusive agent for Norden; and prior to fixing the relevant COA's, the scope of any duties owed to Norden has to be evaluated against the background that Panamax Bulk was also promoting the interests of other competing shipowners as well as Norden. Moreover, it seems to us that it is probably correct to treat Panamax Bulk as being subject to a separate retainer, and assuming separate undertakings, as regards each COA which it negotiated and concluded on Norden's behalf, rather than being under some overarching retainer which applied to all COA's concluded on Norden's behalf.

Breach

180. It is important to stress that this is not a case in which it is suggested that the agent (Panamax Bulk) made any form of secret profit or took any other form of personal benefit out of the arrangements concerning the 2.5% commission payable to Natica (or those standing behind Natica). Panamax Bulk only received 1.25% commission and Norden had fully consented thereto.

181. It is also important to stress that this is not a case in which Rusal is suing Panamax Bulk for dishonest assistance in, or procuring the breach of duty of Rusals' agent (Natica). The relevant question is whether, and to what extent, Panamax Bulk breached its duties to Norden.

182. There was no breach of duty on the part of Panamax Bulk as regards the initial concluding of the September 2007 COA. Nor do we find that Panamax Bulk was in breach of duty in relation to the agreeing of the variation to the September 2007 COA, by signing the formal COA on Norden's behalf. The basis for this conclusion is set out at paragraph 58 above.

183. As regards the concluding of the November 2007 COA's, Norden alleges a number of breaches which we address in turn.

184. First, it is alleged that Panamax Bulk wrongfully deleted all references to commission in communications passed to Rusal from Norden; and wrongfully reinstated such references in communications passed to Norden from Rusal. On any view it was Norden's duty as agent, even a non-exclusive one, to communicate the offers and counter-offers accurately and truthfully. This it did not do. As agent for Norden, it gave Rusal to understand that Norden was prepared to accept $64.65 per mt (the Porto Vesme COA) and $55.50 per mt (the Aughinish COA) when in fact, because Norden was prepared to pay a 2.5% commission on Charterers' side which Rusal was not demanding, Norden was prepared to accept approximately $63 and $54 per mt (net of the 2.5%) respectively; by exaggerating Norden's bottom line negotiating position to Rusal, Norden could have been disadvantaged if other interested owners had come in at such low levels. Even more relevantly, as agent for Norden, it received Rusal's counter-offers which demonstrated that Rusal was ultimately prepared to pay $64.65 and $55.50 per mt <u>net</u> to Norden

58

and yet it led Norden to believe that Rusal was only prepared to agree to pay these sums gross, ie including a 2.5% commission on its side which Norden would have to pay out of the gross freight. What Panamax Bulk communicated back to Norden therefore undervalued the true negotiating position of Rusal. In our view, and in both respects, Panamax Bulk was in breach of duty by failing to communicate accurately and truthfully the true negotiating position of each side and by deleting and reintroducing the references to commission in the way that it did.

185. Secondly, it is alleged that the alteration of the recaps, evidencing the concluded agreement between the parties, so that one version revealed and the other version did not reveal the commission arrangements, was a breach of duty towards Norden. We agree, essentially for the same reasons as set out in the previous paragraph. It is unprecedented to have two conflicting recaps. Panamax Bulk was undoubtedly obliged to draw up consistent recaps which accurately reflected the real bargain which had been made.

186. Thirdly, it is alleged that the redacting of the signed Norden official letters amounted to a breach of duty towards Norden. Again, we agree. This was a serious breach of duty; it was unauthorised and amounted (in effect) to the forging of what purported to be official signed confirmations of the terms of the COA's, in circumstances where Panamax Bulk knew that the redacted terms were incomplete.

187. Fourthly, it is alleged that the private agreement to pay commission to Natica, the concealing of that fact from Rusal, and the concealing from Norden of the fact that the commission arrangements were being kept secret from Rusal amounted to further breaches of duty towards Norden. We agree. Norden was entitled to expect that its agent would not make private agreements with the agent of Norden's contractual counterparty, would not be complicit in keeping the commission arrangements pertaining to charterers' agents secret from charterers, and would not be complicit in keeping such secrecy (from charterers) secret from Norden.

188. Fifthly and finally, it is alleged that the introduction of Maguire into the payment chain was information which Norden was entitled to know, particular once Norden repeatedly asked for information

on this score. We are not convinced that it would be incumbent in every case for a broker to identify the actual account into which the sub-broker's legitimate commission was to be paid. However, on the facts of this case, once serious question marks had been raised as to the entitlement to and the recipient of the 2.5% commission, it was incumbent upon Panamax Bulk to answer Norden's questions truthfully and accurately as regards the identity of the real beneficiaries of the 2.5%. In fairness to Mr Riis, he wanted to do so and, as he acknowledged to us, he regarded it as his duty to do so, but was prevented by misguided loyalty to Mr Osipov from so doing. In preferring to safeguard Mr Osipov's desire for secrecy in that respect, he wrongly subordinated his duties of loyalty and fair dealing to his principals, Norden.

189. The list of breaches of duty is a long one; and there may be other ways in which it could be said that Panamax Bulk's conduct fell short of the standard to be expected of a broker, properly and faithfully fulfilling its duties. The foregoing analysis does not depend on any finding of dishonesty on Mr Riis' part. Objectively, we consider that Panamax Bulk fell far short of the standards to be expected of a broker in its position.

190. Furthermore, we have no doubt that such breaches of duty are properly to be regarded as 'serious' breaches of duty or as repudiatory breaches of duty, which entitled Norden to put an end to the relationship of principal and agent, as regards the November 2007 COA's, which they duly did on 5 September 2007.

Dishonesty?

191. In the light of the previous conclusions, we are not convinced that this aspect, and the legal arguments concerning dishonest assistance and knowing receipt, really matter. As we have said, this is not an arbitration involving any claim by Rusal and we are not convinced that the characterisation of Mr Riis' conduct as 'dishonest' would alter in any material respect the legal consequences which follow from what we have held to be serious and repudiatory breaches of duty on Panamax Bulk's part. The allegation having been made, however, it is right that we record the following.

192. First, we are not prepared to find that Mr Riis or Panamax Bulk acted dishonestly towards Norden, either as regards the

concealment from Rusal, or elements at Rusal, of the 2.5% commission payable to Natica (or its principals); or as regards the less than full disclosure given to Norden on that topic. There is no doubt that Mr Riis appreciated that Norden was happy to pay the 2.5% commission, on top of the 1.25% payable to Panamax Bulk; and we accept that he may genuinely have felt that Norden would not have got the business had it not been for Natica's involvement, albeit behind the scenes, with board members or other management at Rusal. He also indicated to Norden, most notably in Moscow on 11 December 2007, although nowhere near explicitly enough, that Rusal had issues with Natica which it was best left unexplored. It was apparent to him that Norden was not greatly concerned by such internal issues. This is not to condone the lack of transparency on the part of Panamax Bulk but the epithet of 'dishonesty' is not one which we would use in that context. Knowing what he knew of the transaction, we are not persuaded that even by an objective standard, his actions towards Norden should be characterised as 'dishonest.'

193. Secondly, it is undoubtedly the case that Panamax Bulk, and Mr Riis, assisted in a scheme whereby, at least as regards the November 2007 COA's, Natica received a 2.5% commission to which Rusal had not consented and to which Mr Riis must have known, and we conclude did know, that significant elements within Rusal had not consented. His knowing participation in the scheme involved not alerting anyone at Rusal to Natica's involvement in the November COA's or to Natica's entitlement to commission thereunder so as not to upset the 'apple cart' as regards any anti-Natica elements within Rusal. In this regard, he sided with Natica against those elements within Rusal who wished to cut Natica out of involvement in the COA's. There was serious culpability on Mr Riis' part in being privy to the deception of Mr Ovchinnikov. However, there are some mitigating factors, as we have discussed previously; and there are important gaps in the evidence. It remains unclear what exactly Mr Riis' subjective knowledge was as regards the extent to which Mr Osipov may or may not have been authorised by some, but not by others to continue to act on Rusals' behalf, amidst the internal power struggle which would made this question almost impossible to assess. In the circumstances, we are not persuaded that his assistance should be characterised as dishonest, even by an objective standard; nor that his receipt of the 2.5% commission for onwards transmission should be so characterised either.

194. The first consequence, and the most straightforward of all, is that as from 5 September 2008, when Norden legitimately terminated its existing contractual relationship with Panamax Bulk as regards the November 2007 COA's, and whether under the November 2007 COA's themselves or under any independent retainer(s) in relation thereto, any right to future commission as regards freight, dead-freight or demurrage not yet earned under the November 2007 COA's fell away. Panamax Bulk has no right to commission on any sums earned after 5 September 2008 as regards the November 2007 COA's (and whether in debt or, as regards the Porto Vesme COA) in damages. We are not persuaded that the same reasoning applies to the September 2007 COA in respect of which, on our findings, there was no repudiatory breach of Panamax Bulk's obligations at all.

195. The second consequence, and equally conventional, is that in consequences of such breaches, Norden is entitled to damages. Panamax Bulk's breaches of contract led to the position where Norden agreed to pay 2.5% commission to 'charterers' side' in respect of the November 2007 COA's when charterers (ie Rusal) had not sought any such commission. Norden was thereby made to pay 2.5% commission out of the freight when it would not otherwise have had to do so. We recognise that, had there been total transparency, Rusal might theoretically still have insisted on the receipt (by Rusal) of some form of address commission, probably 1.25% and no more, but on the face of it, Norden have paid 2.5% commission to a party (Natica) or an ultimate payee (Maguire) which they would not otherwise have paid. The 2.5% commission payments made to Panamax Bulk for onwards transmission were procured by Panamax Bulk as a result of Panamax Bulk's breaches of duty. We conclude that the total amount of such payments already made, insofar as comprising the 2.5% proportion of the commission, is recoverable as damage for breach of duty. The same figure would also be recoverable under the next head.

196. The third potential consequence is the most difficult. There is a principle of law, discussed in Bowstead & Reynolds Article 60 and classified as *"penal in operation"* that in the event of serious or repudiatory breach of duty on the part of an agent in relation to a

transaction, the agent can recover no commission at all. This is not a compensatory rule but effectively a deterrent to ensure that fiduciaries do not abuse their position.

197. There was very little citation of authority on this point in the parties' written or oral submissions. Andrews v Ramsay [1903] 2 KB 635 was the only case referred to by Norden and Panamax Bulk did not purport to challenge the principle of law which the decision sought to establish. This was a case of an agent who made a secret profit and, on the facts, it was held that it was impossible to say what the principal's financial position would have been, had the agent acted honestly. The relevant principle was laid down in clear terms – *"A principal is entitled to have an honest agent, and it is only the honest agent who is entitled to any commission ... if an agent directly or indirectly colludes with the other side, and so acts in opposition to the interest of his principal, he is not entitled to any commission."* To similar effect see Rhodes v Macalister (1923) 29 Com. Cas. 19.

198. In Salomons v Pender (1865) 3 H&C 639, the Court approved the following passage from Story on Agency:

*"in matters touching the agency, agents cannot act so as to bind their principals, where they have an adverse interest in themselves. This rule is founded upon the plain and obvious consideration, that the principal bargains, in the employment, for the exercise of the disinterested skill, diligence and zeal of the agent, for his exclusive benefit. It is a confidence necessarily reposed in the agent, that he will act with a sole regard to the interests of his principal, as far as he lawfully may ... "*

199. Applying the principle to the facts of this case, Panamax Bulk did not make a secret profit for itself. However, and as regards the November 2007 COA's, it did 'collude with the other side' (or the purported agent of 'the other side') and thereby obtained a commission for Natica to which Rusal did not truly consent, and on that account, to which Norden did not truly consent. Although Panamax Bulk was not bargaining for itself, it was in a real sense bargaining for another (Natica) and Norden, as its employer, was not receiving 'the disinterested skill, diligence and zeal' of its agent, 'for its exclusive benefit.' As a result, Norden earned less (in terms of net freight) than would otherwise have been the case. In our view, the relevant principle was engaged on the facts of this

case. For a recent application of the rule, in analogous circumstances, see The "Peppy" [1997] 2 LLR 722.

200. Such conduct clearly disentitles Panamax Bulk from claiming any part of the 2.5% commission and renders it liable to give restitution of the 2.5% commission already paid. This provides an additional justification to the recovery of such sums by way of damages.

201. However, and more swingeingly, a strict application of the 'no commission' rule would deprive Panamax bulk of the 1.25% already paid, or still to be paid in accordance with our earlier findings, either in debt or as damages. Here, we are dealing with (i) unpaid 1.25% commission earned on the September 2007 COA; (ii) already paid 1.25% commission on the Trombetas COA and further instalments of unpaid 1.25% commission earned on the Trombetas COA up until 5 September 2008; and (iii) already paid 1.25% commission on the Porto Vesme COA and further instalments of unpaid 1.25% commission earned on the Porto Vesme COA, or recoverable in damages in like amount, up until 5 September 2008.

202. So far as concerns Panamax Bulk's entitlement to 1.25% commission under the September 2007 COA, we have not found that Panamax Bulk committed any breach of duty towards Norden in relation to the concluding or variation of that COA. Insofar as concerns any subsequent refusal to identify Maguire as the co-broker, in correspondence during 2008, it is fair to say that this correspondence was directed primarily towards the November 2007 COA's as no invoices had been presented in respect of the September 2007 COA. Although the claim for 3.75% commission under the September 2007 COA was raised occasionally in this correspondence, we are not prepared to hold that for that reason alone, Panamax Bulk was thereby in repudiatory breach or otherwise in 'serious' breach of its obligations under the September 2007 COA so as to disentitle it from claiming its 1.25% commission under the September 2007 COA. Nor do we see why any (repudiatory) breach of duty in relation to the November COA's should disentitle Panamax Bulk from its entitlement to a 1.25% commission under the September 2007 COA. As the editors of Bowstead state, *"there can obviously however be cases where the agent effects severable transactions, and in these cases the rule depriving him of commission will only apply to those in respect of which he is in breach of duty."*

203. More difficult, however, is the 1.25% claim under the Trombetas and Porto Vesme COA's. We have given careful consideration to whether a line can be drawn between the serious breaches of duty in relation to the 2.5% payable to Natica and the absence of any breach of duty in relation to the 1.25% commission payable to Panamax Bulk.

204. In particular, this is not a case in which Panamax Bulk was entitled to an entire 3.75% commission for itself and, by dint of serious breaches of duty in relation to that commission, should be held to have disentitled itself to any part of that commission. It was Norden's case, which we accept, that the 3.75% commission was 'for division' between Panamax Bulk (as to 1.25%) and Natica (or Charterers' side) as to 2.5%. Although the entire commission was payable to Panamax Bulk in the first instance, this was a mechanism by which 2.5% would be paid on to Natica. Norden's case on the non-application of the 1999 Act to Natica's 2.5% share depends upon this interpretation of the bargain. We are in substance, therefore, dealing with two severable entitlements to commission: one (Panamax Bulk's) in relation to which there is no relevant breach of duty; and one (Natica's) in relation to which there was serious breach of duty. Panamax Bulk's culpability related exclusively to its contracting for Natica's benefit and then attempting to recover for Natica's benefit in respect of the 2.5% share.

205. However, the drawing of this distinction would be taking the concept of a 'severable transaction' to a new level. Moreover, we are not ultimately persuaded that it is justifiable. Imagine that the original commission arrangements had been left unamended so that Norden had only to pay 1.25% commission to Panamax Bulk, with Natica's 2.5% commission still being payable by deduction from freight; and imagine that Panamax Bulk had colluded with Natica so that Rusal did not know that Natica was being paid out of freight (through arrangements similar to those involving Ocean) and so that Norden was effectively receiving less freight than should have been the case. If Panamax Bulk had claimed for its 1.25% commission on such facts, the 'penal rule' would surely have applied; and it would have been no answer that Panamax Bulk's breach of duty related not to the amount of its own commission but to other aspects of the contract being concluded on its principal's behalf, which reduced the net freight received by Norden.

206. On the actual facts of the present case, another way of reaching the same conclusion might be to say that (as regards the November 2007 COA's), the concluding of two fixtures providing for the payment of a secret commission to an agent (or purported agent) of the charterers, without the knowledge of the charterers, was not authorised (as between Norden and Panamax Bulk). It might be said (see Bowstead para 7-047 subparagraph (1)) that there was no entitlement to commission on Panamax Bulk's part as regards such an unauthorised transaction.

207. In these circumstances, and although we recognise that this is a somewhat adventitious outcome, so far as Norden is concerned, we conclude that the penal rule does oblige us to deny Panamax Bulk's claim to the 1.25% commission under the November 2007 COA's, both as regards sums which remain unpaid and sums which have already been paid, but which will now have to be repaid.

Equitable set-off

208. The end result can be summarised as follows.

209. First, we have upheld Panamax Bulk's entitlement to 1.25% commission on freight, dead-freight and demurrage earned on the September 2007 COA. The quantum of this claim is agreed as US$291,384.76.

210. Secondly, we have held that Panamax Bulk is not entitled to any further commission on the Trombetas and Porto Vesme COA's.

211. Thirdly, we have upheld Norden's entitlement to recover from Panamax Bulk the entirety of the 3.75% commission paid under the 12 invoices previously settled in respect of the Trombetas and Porto Vesme COA's. The agreed quantum of this counterclaim is US$1,063781 (for the Porto Vesme COA) and US$594,169.76 (for the Trombetas COA).

212. These are three separate references. It is therefore not open to us simply to deduct the sums ordered to be payable to Panamax Bulk under paragraph 209 from the sums ordered to be payable to Norden under paragraph 211 and produce an award for the net amount payable to Norden of US$1,366,566. Indeed, the Claimant's very sensible agreement that we could produce a single

award in this matter was given expressly on the basis that the three references remained separate as regards the ability (or inability) of Norden to set-off amounts paid between separate contracts and references.

213. However, and anticipating this potential difficulty, it was Norden's pleaded case, as articulated in its submissions, that the doctrine of equitable set-off permitted it to raise by way of defence to any claims for unpaid commission under the September 2007 COA any sums which were repayable to Norden by way of restitution or damages in relation to the Porto Vesme and/or Trombetas COA's.

214. The basis for this contention is that although Panamax Bulk's claim for commission in relation to the September 2007 COA and Norden's claim for repayment of commission in relation to the Trombetas and Porto Vesme COA arose under different contracts, there was a sufficient "close connection" between Panamax Bulk's claim and Norden's cross-claim in the sense considered by the Court of Appeal in Bim Kemi AB v Blackburn Chemicals Ltd [2001] 2 LLR 93 and it would be "manifestly unjust" to allow one claim to be enforced without taking account of the other. We stress that there is, and could be no jurisdictional objection to that submission; the only question for us is whether the substantive defence of equitable set-off has been established in the present circumstances.

215. In our view, the necessary ingredients of the equitable set-off defence have been established. Although we are dealing with three different contracts, they all arose out of the same trading relationship between shipbroker and shipowner within a period of no more than a few months; the basis of Norden's cross-claim concerns an inquiry into the conduct of Panamax Bulk in relation to the payment of commission in relation to all three COA's; and Norden purported to terminate its entire relationship with Panamax Bulk in respect of all three COA's by a single notice on 5 September 2008 for essentially common reasons. The fact that we have held that Norden was only entitled to terminate its relationship with Panamax Bulk in relation to two COA's and that Panamax Bulk did not repudiate its obligations as brokers in relation to the September 2007 COA (and is therefore still entitled to its commission thereunder) should not obscure the very close connection between claim and cross-claim. Indeed, on 15 September 2008, Panamax Bulk duly sought to accept Norden's

alleged repudiation as grounds for terminating its entire relationship with Norden. Furthermore, it would in our view be manifestly unjust to allow enforcement of the claim under the September 2007 COA without taking into account the cross-claim in relation to the November 2007 COA's. We say this, not merely because of the close connection between claim and cross-claim but also because much has been made during the course of these references of the alleged impecuniosity of Panamax Bulk. In circumstances where we understand that security and counter-security have been provided in foreign jurisdictions, it would be unacceptable were Panamax Bulk to be able to enforce its claim in relation to the September 2007 COA without taking into account Norden's closely connected, and much greater cross-claim in relation to the November 2007 COA's.

216. For the avoidance of doubt, however, we hold that the same reasoning must apply in reverse. The necessary close connection between claim and cross-claim means that it would be manifestly unjust to allow Norden to enforce its claims without taking into account Panamax Bulk's claim under the September 2007 COA and to that extent therefore, Panamax Bulk too is entitled to a (pro tanto) defence of equitable set-off.

217. Accordingly, and by virtue of the equitable set-off defence, Panamax Bulk's claim under the September 2007 COA fails; and Norden is entitled to repayment of the net sum of US$1,366,566 in relation to the Trombetas and Porto Vesme COA's.

218. In the exercise of our discretion, we consider that interest should run at 4% on the net sum from 5 September 2008, the date when Norden terminated the relevant retainer(s) as regards the November 2007 COA's. We recognise that this involves a fairly 'rough and ready' approach to the starting date for the running of interest. However, we have not been given full details of the dates of each voyage under the September 2007 COA; and whilst we recognise that each payment made by Norden under the November 2007 COA's was made prior to 5 September 2008, it was only at that date that Norden sought to terminate its contractual relationship(s) with Panamax Bulk. We consider that a netting-off of the principal sums for interest purposes at the indicated date should broadly meets the justice of the case. We consider it appropriate that the interest awarded should be compounded at three-monthly rests.

219. Finally, although our conclusions entail that, viewed overall, Panamax Bulk has clearly 'lost' these arbitrations, it succeeded on some aspects (most notably, the September 2007 COA claim and the section 2 issue) and we have received no submissions on costs. We are not sufficiently confident that we have been given the necessary information to determine the incidence of costs. Regrettably, therefore, our award will have to reserve all questions of costs, including all questions concerning the ultimate incidence of our own costs.

220. It remains to thank the parties, and their legal advisers for their assistance and their submissions. This has been a bitterly contested and at times, acrimonious dispute, perhaps unsurprisingly considering the issues involved. Nonetheless, the arbitration hearing was conducted, as one would expect, with courtesy and skill on both sides. In a very difficult case, that has made our task both easier and harder at the same time.